**Alden JENKINS, et al., Plaintiffs,**

v.

**RED CLAY CONSOLIDATED SCHOOL DISTRICT BOARD OF EDUCATION, et al., Defendants.**

**Civ. A. No. 89–230 LON.**

United States District Court, D. Delaware.

Dec. 27, 1991.

Gary W. Aber, of Heiman, Aber & Goldlust, Wilmington, Del. (Brenda Wright and James Halpert of the Lawyers' Committee for Civil Rights Under Law, Washington, D.C., of counsel), for plaintiffs.

Alfred J. D'Angelo, Jr., of Pepper, Hamilton & Scheetz, Wilmington, Del. (Thomas J. Manley, and John R. McArthur of Hunton & Williams, Raleigh, N.C., of counsel), for defendants.

### OPINION

LONGOBARDI, Chief Judge.

This is a class action suit arising under section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973. The named representative Plaintiffs brought the action on behalf of all of the eligible black voters in the Red Clay School District ("District"). They allege that the current method of electing members of the Red Clay Board of Education ("Board") unlawfully dilutes the

voting strength of black citizens and has the effect of providing black citizens in the Red Clay School District less opportunity than white citizens to participate in the political process and to elect candidates of their choice to the Red Clay Board of Education.

After denying a motion for preliminary injunction, the Court scheduled the matter for trial. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (4) and 42 U.S.C. § 1973j(f). The Court also has jurisdiction to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

## BACKGROUND

The District was established in November of 1980 by the Delaware State Board of Education. The regulations implementing 62 Del.Law, Ch. 351 describe the method of electing Board members in the District. Docket Item ("D.I.") 84, ¶ 5. Under the 1980 Census, the total population of the District was 123,240, of which 17,180 (13.95%) were black. The 1980 Census also shows that the District had a voting age population of 90,977. Black voting age citizens numbered 10,781 (11.1%). *Id.,* ¶ 22. According to the 1990 Census, the total population of the District is 132,674. The black population is 19,252 (14.51%). The 1990 Census also shows that the District has a voting age population of 102,196, of which 13,257 (12.97%) are black. *Id.,* ¶ 23.

The Plaintiffs do not allege that the method of electing the Board members was established with any discriminatory or unlawful purpose or intent. *Id.,* ¶ 6. Indeed, the State Board reorganization plan, including the method of electing school board members, was reviewed and approved by Judge Schwartz in *Evans v. Buchanan,* 512 F.Supp. 839, 857 (D.Del.1981) ("Five of the twenty-three persons elected to interim boards are black and each received more votes than some of the whites elected to the boards").

There are seven seats on the Board. Members are elected to five year terms and the elections are staggered so that one or two seats are up for election each year. With the exception of the initial election which was conducted in January of 1981, the elections are held annually in May. Candidates must reside in and serve from one of seven nominating districts and elections are non-partisan. The only requirement to become a candidate for the Board is a petition of twenty eligible district voters. There is no voter registration requirement and all district residents over eighteen years of age are eligible to vote. The elections are conducted at-large and voters may vote for only one candidate from each nominating district at any polling place in the district. The candidate receiving a plurality of votes is elected. D.I. 84, ¶ 7. This system has been described as an at-large or multi-member district as opposed to a single-member district scheme.

In 1981, there were elections for six of the seven nominating districts. The board member for the seventh seat, district G, was appointed. In district A, one black candidate and six white candidates ran for the seat; a white candidate won the seat. In district B, one black candidate and five white candidates ran for the seat; the black candidate won the seat. The six candidates running for the district C seat were white. The four candidates running for the district D seat were white. In district E, one black candidate and four white candidates ran for the seat; a white candidate won the seat. The nine candidates running for the district F seat were white.

In 1982, two white candidates ran for the seat in district C. The incumbent white candidate ran unopposed for the seat in district G.

In 1983, a black and a white candidate ran for the seat in district A. In district D, the incumbent white candidate ran against a black candidate. The white candidates won in both elections.

In 1984, three white candidates ran for the seat in district C. Two white candidates ran for the seat in district E.

In 1985, the incumbent black candidate ran against a white candidate for the seat in district B. The white candidate won the seat. In district G, the incumbent white candidate ran unopposed.

In 1986, a white candidate was appointed to fill the seat in district C. In district F, three white candidates ran for the seat.

In 1987, four white candidates ran for the seat in district C.

In 1988, one black candidate and two white candidates ran for the seat in district A. A white candidate won the seat. In district D, the white incumbent candidate ran unopposed.

In 1989, two white candidates ran for the seat in district E.

In 1990, two black candidates ran for the seat in district B. Two white candidates ran for the seat in district G.

In 1991, a black and a white candidate ran for the seat in district C. The black candidate won the seat. In district F, two white candidates ran for the seat. *Id.,* ¶ 11; D.I. 106.

## THE LEGAL STANDARDS

Section 2 of the Voting Rights Act, as amended provides in pertinent part:

(a) No voting ... procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color....

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973 (1988).

The Senate report accompanying the 1982 amendment identified factors which might indicate a section 2 violation:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of Plaintiffs' evidence to establish a violation are:

whether there is a significant lack of responsiveness on the part of elected officials to the particularized need of the members of the minority group.

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

S.Rep. No. 417, 97th Cong., 2d Sess. 28–29, *reprinted in* 1982 U.S.Code Cong. & Admin.News 177, 206–07.

In 1986, the United States Supreme Court examined a multi-member districting plan under the amended section 2. *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). After carefully considering the legislative history of the amendment, the Court decided that without proof of the existence of racial bloc voting, the existence of an at-large election system in conjunction with a lack of proportional representation does not establish a violation. *Gingles*, 478 U.S. at 46, 106 S.Ct. at 2764.

■ The Court stated that while many of the Senate factors may be relevant to a claim of vote dilution, three factors are essential to a claim that an at large election system illegally impedes minority voters' ability to elect representatives of their choice. The minority group must prove that it is "sufficiently large and geographically compact to constitute a majority in a single-member district." *Id.* at 50, 106 S.Ct. at 2766. In addition, the minority group must prove that it is politically cohesive. *Id.* at 51, 106 S.Ct. at 2766. Finally, the minority group must prove that the white majority votes as a bloc in a manner which usually allows the white majority, in the absence of special circumstances, to defeat the minority group's favored candidate. *Id.* The Court also stated that persistent proportional representation of minorities is inconsistent with a claim of vote dilution. *Id.* at 77, 106 S.Ct. at 2780.

With this analytical framework in mind, the Court will consider whether the class has carried its burden of proving that the at-large election system frustrates the black citizens of Red Clay from equally participating in the political process and electing candidates of their choice to the Red Clay School Board.

## ANALYSIS

### I. *Extent of Black Electoral Success (Senate Factor No. 7)*

In many of the reported cases reviewed by this Court, it was clear as a matter of law that the minority group bringing the action was under-represented. *See, e.g., Solomon v. Liberty County*, 865 F.2d 1566, 1574 (11th Cir.1988), *cert. denied,* —— U.S. ——, 111 S.Ct. 670, 112 L.Ed.2d 663 (1991). Although not frequently addressed because of the circumstances of the particular cases reviewed, this factor is critical to a claim of voting rights dilution. *Gingles*, 478 U.S. at 48 n. 15, 106 S.Ct. at 2765 n. 15. ("[T]he most important Senate Report factors bearing on § 2 challenges to multi-member districts are the 'extent to which minority group members have been elected to public office in the jurisdiction' and the 'extent to which voting in the elections of the state or political subdivision is racially polarized.' "). In this case, the parties vigorously dispute how the election results in Red Clay should be interpreted.

■ Three black candidates have been elected to the Red Clay School Board. A black candidate ran against five white candidates and won a seat in 1981. D.I. 84, Stipulated Fact Number 11. In 1990, a black candidate won a seat on the board in a race involving two black candidates. *Id.* In 1991, another black candidate won a seat on the board in a race against one white candidate. D.I. 106.

The Plaintiffs argue that every election won by a black candidate in Red Clay was won under special circumstances and, therefore, cannot be used as a measure of black candidates' success in achieving seats on the Board. They contend that the 1981 election was atypical because it was the only year in which five or six candidates ran for each seat. This, in the Plaintiffs' opinion, fractured or diluted the white vote and allowed the black candidate to be elected.

The Plaintiffs argue that the 1990 election results should not be considered indicative of black voters' ability to elect candidates of their choice because the election occurred after the initiation of this lawsuit. It was the only time that two black candidates ran for the same seat without white opposition. The Plaintiffs admit, however, that it has not been established that the

winning black candidate was or was not the preferred candidate of the black voters.

The Plaintiffs also contend that the 1991 results are of little value because the election occurred after the completion of trial and the Court heard no testimony on the specifics of the election. They have agreed, however, that the Court should take judicial notice of the result.

On the other hand, the Defendants argue that the Court should consider all of the elections which have been won by black candidates. The 1981 election predates this litigation. The Defendants contend that inclusion of the 1990 election result is appropriate because the Plaintiffs have not established that there was any connection between the pendency of this litigation and the results of the 1990 election. Finally, they contend that the result of the 1991 election is important even without analysis because it establishes that a black candidate running against one white candidate can win an election under the current system in Red Clay.

The Court finds that the black candidate who won a seat in 1981 ran against five white candidates and it was was unusual only because six seats were up for election at the same time. This apparently increased voter turnout. Increased turnout, however, affects both black and white voters. Although 1981 was the only year in which six or more candidates ran for a seat, there have been several elections involving more than two candidates in Red Clay. In 1984, 1986 and 1988 there were elections involving three candidates. In 1987, four candidates ran for the seat in district C. The Court finds that because elections involving multiple candidates have occurred in the District, the 1981 election should not be disregarded completely. The Court will not, however, weigh it as heavily as the Court would weigh a black candidate's victory in a smaller field of candidates.

In the 1990 election, the winning black candidate was initially approached by an Hispanic school teacher with the idea that she should run for the School Board. Tran-

script ("Tr."), Volume ("Vol.") G at 65. The winning black candidate ran on a slate with a white candidate who had similar ideologies, including the same position on the feeder pattern issue.[1] Id. at 32–33, 65–67. The white candidate and black candidate were opposed to a single district election system, Id. at 31, 70, and running together allowed the candidates to cover the District more economically. Id. at 33.

Based on this record, the Court finds it fails to establish that the pendency of the litigation caused two black candidates to run unopposed by a white candidate nor was it a reason that the winning black and the winning white candidate decided to run on the same slate. Therefore, the Court will consider this election in evaluating black electoral success. The Court finds, however, that the election does not provide a measure of a black candidate's ability to be elected when running against a white candidate.

With regard to the 1991 election, the Court finds that it is evident that a black candidate did win an election when running against one white candidate under the current election system in Red Clay.

The success of black candidates can also be examined in terms of the number of blacks who were serving on the board each year. From the 1981 through the 1985 elections, one of the seven board members was black. This is approximately 14 percent of the board members. From the 1985 elections through the 1990 elections, none of the Board members were black. From the 1990 election through the 1991 election, one board member was black, again representing approximately 14 percent of the board. Currently two of seven board members, or approximately 28 percent of the board members are black.

In considering whether this is a positive or negative record, the Court begins by noting that approximately 13 percent of the voting age population in the District is black. Assuming proportional representation were appropriate, one would expect that on the average one of every seven

1. The feeder pattern issue relates to the busing of children from one area to a particular school.

board members would be black and that black candidates would win approximately 13 percent of the elections.

The fact is that black citizens have achieved some electoral success in the District. In 1981 through 1985 and in 1990 through the present, black candidates have sat on the board in percentages greater or equal to the proportion of black citizens in Red Clay. When one considers all of the election years, blacks have won 15 percent of the contested seats, 25 percent of the elections involving black and white candidates and 33 percent of the elections involving black candidates. Prior to the initiation of this suit, blacks had won 6.6 percent of the contested elections and 14 percent of the elections involving black and white candidates.

Thus, the Plaintiffs' claim of voting dilution rests on the fact that prior to the institution of this lawsuit, black candidates had won only 6.6 percent of the contested elections. If a black candidate had won one additional seat between the years 1985 and 1990, the Court would find that the black citizens had achieved proportional representation. The Court finds that prior to the initiation of the lawsuit, there was some under-representation of black citizens on the Red Clay Board. The Court also finds, however, that this lack of representation from 1985 through 1990 could very well be attributable to the failure of black citizens to consistently offer themselves as candidates during that period rather than to any defects in the at-large election system.[2] Specifically, in 1986, 1987 and 1989, no black candidates ran for a seat on the Red Clay Board and, as indicated *supra*, there are virtually no procedural restrictions in the system which would chill or frustrate black candidacy.

The Court finds, therefore, that on the whole this Senate Factor does not weigh heavily in favor of the Plaintiffs. *Compare Westwego Citizens for Better Government v. Westwego*, 872 F.2d 1201, 1209 (5th Cir.1989) (no black candidate ever ran in alderman elections); *Solomon* at 1574 (black candidate has never been elected to county-wide office); *Bradford County NAACP v. City of Starke*, 712 F.Supp. 1523, 1528 (M.D.Fla.1989) (no black person has ever been elected to the Starke city commission nor to any other elected city office); *Smith v. Clinton*, 687 F.Supp. 1310, 1312 (E.D.Ark.) (despite a 37 percent black voting age population no black person ever elected to district 48–49 State Representative Seat), *aff'd*, 488 U.S. 988, 109 S.Ct. 548, 102 L.Ed.2d 576 (1988).

Because there has been some under-representation of black citizens on the Red Clay Board and because some of the black candidates' success may have occurred in unusual circumstances, the Court will proceed to consider the *Gingles* threshold factors.

## II. *The Gingles Threshold Factors*

### A. Size and Geographical Compactness of the Black Community

The Plaintiffs introduced undisputed evidence that the black population of Red Clay is sufficiently large and compact to form a majority of the voting age population in a single district if the District were divided into seven single districts. Specifically, a district could be created in which black citizens would constitute 62.7 percent of the total population and 59.75 percent of the voting age population. Tr., Vol. A at 37; Plaintiffs' Exhibit ("PX") 14. The Court finds that the Plaintiffs have proven the first *Gingles* factor by a preponderance of the evidence.[3]

---

2. The Court understands that a sustained inability to elect black preferred candidates could create an atmosphere which discourages blacks from participating in an election system which is perceived as biased. The record in this case, however, does not support such a finding. A black candidate was successful in the first election in Red Clay and sat on the Board until May of 1985. The Court considers the minimal structures on nominations of candidates for Board seats to be different from the nominating process for State, County and City positions and an important factor in evaluating the underrepresentation of blacks during some of the years in question.

3. Although the Defendants agree that the Plaintiffs' evidence satisfies the first *Gingles* factor, they question whether such a district would allow the black citizens to consistently elect one

### B. Political Cohesiveness of the Black Community

The Plaintiffs introduced expert testimony and lay testimony on the issue of the political cohesiveness of the black community in Red Clay.

#### 1. *Expert Testimony*

Plaintiffs' expert on racial polarization, Dr. Lichtman, testified that there is no accepted definition of political cohesiveness. He testified, however, that in United States political history, voter support of 60 percent or more is considered a landslide level of support for a candidate. He suggested that when groups voted in excess of landslide proportions for a candidate, one could conclude that the group was politically cohesive. Tr., Vol. B at 21–22.

Dr. Lichtman examined several Red Clay School Board elections in which black candidates ran against white candidates. He also studied many "exogenous elections", city and county elections in which a portion of the electorate was comprised of residents of the District. The techniques he used to analyze the elections can be divided into two main groups: inferential techniques and descriptive techniques. PX 7 at 3.

#### (a) *Inferential Techniques*

The inferential technique involves an ecological regression procedure which estimates the behavior of population groups based upon an equation which is computed for all the political units included within the analysis. PX 7 at Appendix A. The regression equation used by Dr. Lichtman studied the association between two variables: (1) the vote received by the black candidate, and (2) the racial composition of the political unit. The correlation coefficient, expressed as $R^2$, indicates the degree of association between these variables. Social scientists generally consider $R^2$ values in excess of .5 to be indicative of a strong association. PX 7 at 11.

When strong racial polarization occurs, Dr. Lichtman said ecological regression analysis will often produce impossible results. *Id.* at 64. For example an ecological regression may estimate that 110 percent of the black voters cast their vote for the black candidate. When his ecological regression estimates produced impossible results, Dr. Lichtman used the "method of bounds" to set the black vote for the black candidate at 100 percent and recalculated the regression estimates. *Id.* at 65.

Unfortunately, Dr. Lichtman performed a single ecological regression analysis on only one District election. Because Red Clay voters are not required to vote at any particular polling place, he testified it is necessary to have the sign-in or registration sheets in order to match voters with their election districts. *Id.* at 36–37. Once the voters are assigned to their appropriate election district, the race of the voter can be estimated by referring to census information indicating the racial composition of the district. The sign-in sheets for the elections, however, are destroyed after two or three years. Consequently, sign-in sheets were available for only one contest between a black and a white candidate. This was the 1988 election.[4] *Id.* at 77.

Dr. Lichtman testified that his regression analysis estimates showed that in the 1988 Red Clay election virtually 100 percent of the black voters voted for the black candidate and less than 1 percent of the white voters voted for the black candidate. The $R^2$ for this regression estimate was .91. *Id.* at 44. The confidence intervals he reported were ± 20 percent for the estimate of the black voters and ± 3 percent for the estimate of the white voters. PX 52.[5] He

---

candidate of their choice. Tr., Vol. D at 220–25; DX 42 at Tab H. This concern, however, does not negate a finding that the Plaintiffs have proven the first *Gingles* factor.

4. Sign-in sheets were available for the 1988, 1989 and 1990 elections but only the 1988 election was one between a black and a white candidate.

5. The confidence intervals were reported at the 95 percent level, which means that a researcher assumes that there is a 95 percent probability that the actual percentage of black voters voting for the black candidate was between 80 and 120 percent (100 ± 20) and the actual percentage of white voters voting for the black candidate was between negative 3 and positive 3 percent (0 ± 3).

testified that these results are indicative of strong racial polarization among the voters of Red Clay. *Id.* at 45.

Dr. Lichtman also analyzed several city and county elections involving contests between black and white candidates using ecological regression. The results of the single seat elections are summarized in the following table:

| Election | % B vote for BC [6] | % W vote for BC [7] | $R^2$ |
|---|---|---|---|
| 1990 Dem. Prim. New Castle County Dist. 4 | 100% | 38% | .74 |
| 1988 Dem. Prim. Mayor | 85% | 6% | .88 |
| 1988 Dem. Prim. Council Dist. 2 | 95% | 23% | .89 |
| 1988 Dem. Prim. Council Dist. 7 | 100% | 20% | .97 |
| 1986 Dem. Prim. New Castle County Dist. 4 | 100% | 11% | .83 |
| 1984 Dem. Prim. Mayor | 76% | 3% | .91 |
| 1984 Dem. Prim. Council Pres. | 94% | 13% | .93 |
| 1984 Dem. Prim. Council Dist. 2 | 66% | 34% | .78 |
| 1984 General Council Pres. | 100% | 53% | .76 |
| 1982 Dem. Prim. New Castle County Dist. 4 | 75% | 3% | .95.[8] |

Dr. Lichtman also studied several exogenous multiple seat elections. PX 10 at 2. Based upon the single Red Clay election and all of his exogenous election work, Dr. Lichtman concluded that the black citizens of Red Clay consistently vote in greater than landslide proportions for the black candidate in elections between black and white candidates. *Id.* at 124–25.

Dr. Lichtman's ecological regression work was criticized by the Defendants' ex-

pert, Dr. Dunivant. Dr. Dunivant contended that ecological regression provides reliable estimates of an individual voter's behavior only when certain criteria are met. According to Dr. Dunivant, estimates from ecological regression cannot be accepted unless the assumption of constant proportions or correct model specification is met. Tr., Vol. D at 95–96. Dr. Dunivant stated estimates must also exhibit appropriate precision and reliability before they are considered reliable. *Id.* at 152. The re-

**6.** This heading indicates the percent black vote for the black candidate.

**7.** This heading reflects the percent white vote for the black candidate.

**8.** All of this information is taken from PX 7 at 27–29.

searcher must also verify that the confidence intervals of the regression are not biased. Defendants' Exhibit ("DX") 42 at 17. Finally, the confidence intervals must exhibit normality of distribution in order to be reliable. DX 42 at 18. Dr. Dunivant testified that most of Dr. Lichtman's analyses failed one or more tests. Dr. Dunivant's critique of Dr. Lichtman's ecological regression work is summarized at Tab B of DX 42.

Dr. Dunivant raised an additional criticism with regard to using the exogenous elections to predict the voting behavior of the citizens in the Red Clay elections. In most of the exogenous elections, only 7 to 25 percent of the Red Clay electorate were eligible to vote and only 19 to 59 percent the black voters of Red Clay were eligible to vote. Generally, only 4 to 21 percent of the white electorate of Red Clay was eligible to vote in the exogenous elections. DX 42 at G. Furthermore, the racial composition of the districts in the exogenous elections differs from the racial compositions of most of the districts in the Red Clay School District. The election systems are different and the issues in the elections are not the same. Dr. Dunivant stated that patterns appearing in the exogenous elections were not necessarily indicative of voting patterns of Red Clay voters. DX 42 at 19–21.

Dr. Dunivant also testified about regression analyses he performed on the 1988, 1989 and 1990 Red Clay elections to determine if there was a correlation between a candidate's position on mandatory reassignment of the A.I. duPont students and the voter's high school attendance zone residence. He testified that the data indicated there was a correlation between the neighborhood of a voter and voter's choice of candidates with a particular view on the feeder pattern issue. He would not however, rely upon these regressions because several assumptions were violated. *Id.* at 211–12.

Upon cross examination, Dr. Dunivant agreed that he could not conclude that there was not racial polarization in Red Clay; his position was that the evidence did not support a finding of racial polarization. Tr., Vol. E at 41. He also agreed that in previous voting rights litigation he had applied fewer tests and may have applied more lenient standards to data than he applied to Dr. Lichtman's results in this case. *Id.* at 57, 63.

In rebuttal to Dr. Dunivant's criticisms, Dr. Lichtman testified that the method of bounds was an acceptable procedure to use when impossible results were produced by ecological regression and he supplied literature references to support his testimony. Tr., Vol. F at 48–52. Dr. Lichtman also testified that as long as a voter's choice of a candidate was not correlated to the percentage of minority voters in the District, the results produced by ecological regression would be reliable even if the specification test was not satisfied. *Id.* at 77. Dr. Lichtman contended that Dr. Dunivant improperly chose too high a level of statistical significance for some of the tests he performed and that by multiplying the number of tests he used, Dr. Dunivant greatly increased the likelihood that Dr. Lichtman's results would fail the tests due to pure chance. *Id.* at 64, 76. Dr. Lichtman also testified that any correlation between a voter's neighborhood and the vote for candidates with a certain position on the feeder pattern issue did not negate his findings that black voters generally vote for black candidates in greater than landslide proportions. *Id.* at 124.

(b) *Descriptive Methods*

The descriptive methods used by Dr. Lichtman included the study of scatterplots, squared correlation coefficients, extreme cases and actual results of elections with black and white candidates.

Dr. Lichtman prepared scatterplots of the 1988 Red Clay elections and the single seat exogenous elections he had studied. In general, the scatterplots depicted the percentage of votes received by the black candidate as a function of the percentage of blacks in the electorate of each district. Based upon these scatterplots, Dr. Lichtman testified that as the proportion of black voters in a district increases, the per-

centage of votes received by the black candidate also increases. Tr., Vol. B at 98.

Dr. Lichtman was unable to do extreme case analyses for black voters in any Red Clay election because none of the current districts in Red Clay are predominantly black. *Id.* at 46. Nine of the exogenous elections had two districts which had a black population of over 70 percent. In the single seat elections, the black candidate received 60 percent or more of the votes in the predominantly black districts in six of these elections.[9] PX 7 at Table 1. Based upon these descriptive analyses, Dr. Lichtman concluded that the black voters of Red Clay usually exhibited strong support for a black candidate. *Id.* at 105.

Dr. Dunivant stated that a district which was only 70 percent black was not an appropriate district to use for an extreme case analysis. He suggested that a district with a black population of 90 percent or more should be used for such an analysis. DX 42 at 20-21.

The Court finds the testimony of Dr. Lichtman to be more persuasive on the issue of the political cohesion of the black voters of Red Clay. The Court finds Dr. Lichtman convincingly rebutted Dr. Dunivant's criticisms of his work. Specifically, the Court finds that the use of the method of bounds is appropriate, at least to the extent that it is used to set estimates which are within the confidence intervals produced by the regression analysis. Although there was analysis of only a single Red Clay election, the Court finds that many of the exogenous elections can be used as an indication of the political cohesiveness of the black voters of Red Clay because greater than 50 percent of the black Red Clay voters were eligible to vote in those elections.[10] The scatterplots do support the ecological regression results. No district with a 90 percent black population existed

for Dr. Lichtman to study. Although the 70 percent districts are not as convincing as a 90 percent district would be, they do support the ecological regression work done by Dr. Lichtman. Although the feeder pattern issue may have influenced how voters in some neighborhoods voted in School Board elections, the Court is satisfied with Dr. Lichtman's demonstration that the feeder pattern analysis did not negate his finding of political cohesion among black voters.

### 2. Lay Witness Testimony

The Plaintiffs introduced a limited amount of lay testimony on the issue of political cohesion in the black community of Red Clay. One witness called by the Plaintiffs testified that she and a majority of the black community supported black candidates for the Red Clay School Board in the 1981, 1983 and 1985 elections. Tr., Vol. A at 84. One of the named Plaintiffs testified that when he ran for the board in 1981 and 1985 he received the support of the majority of the black community in Red Clay. *Id.* at 146. Another named Plaintiff testified that she usually voted for black candidates because she thought they would be likely to be sensitive to her concerns. *Id.* at 193.

The lay testimony was not one-sided. All three of the named Plaintiffs have supported a white candidate over a black candidate in at least one Red Clay election. Jenkins Deposition ("Depo.") at 50; Roberts Depo. at 37-38; Tr., Vol. A at 196. In the 1983 and 1988 elections, two of the three named Plaintiffs voted for a white, rather than a black candidate. Roberts Depo. at 26: Tr., Vol. A at 196. Even though the lay testimony was mixed, the Court finds that in conjunction with the expert testimony it at least tends to support a finding that the black voters of Red Clay are politically cohesive.

---

9. Dr. Lichtman also studied the New Castle County district 1 results for the 1982 democratic primary. The three predominantly black districts he studied in that election were outside the boundaries of the Red Clay School District. Therefore, the Court did not consider these results in this section of the analysis.

10. With the exception of the 1984 Democratic Primary City Council District 2, 1988 Democratic Primary City Council District 2, and the 1988 Democratic Primary City Council District 7 elections, the exogenous elections covered 50 percent or more of the black voting age population of Red Clay.

Given the meager expert analysis of black citizens voting in Red Clay elections and the mixed lay testimony, however, the evidence of minority voter cohesion in *Red Clay* has not been established by clear and convincing evidence but it was sufficient to establish by a preponderance of the evidence that black voters of Red Clay usually are politically cohesive. The Court, therefore, concludes that the Plaintiffs have established the second factor of the *Gingles* analysis.

### C. White Bloc Voting

There was expert and lay testimony introduced on the issue of white bloc voting. In making a finding on the issue of white bloc voting the Court must consider whether the white voters of Red Clay vote in a manner which usually allows the white majority to defeat the black voters' choice of candidate.

### 1. *Expert Testimony*

#### (a) *Inferential Techniques*

The Plaintiff's expert, Dr. Lichtman, relied upon the 1988 Red Clay Election regression analysis and the exogenous election analyses discussed in the previous section to reach a conclusion on white bloc voting. He testified that these results indicated that the white voters of Red Clay usually voted as a bloc to defeat the black voters' choice of candidate. Tr., Vol. B at 126. Dr. Dunivant raised the same criticisms to this conclusion as he did on the issue of political cohesion of the black community.

The Court finds that Dr. Dunivant's criticism of using exogenous elections to predict the voting patterns of white Red Clay voters is well taken. In contrast to the black community of Red Clay where over 50 percent of the voters were eligible to vote in the exogenous elections, less than 21 percent of the white Red Clay electorate were eligible to vote in those same elections. DX 42 at G. In three of the exogenous elections, less than 10 percent of the white Red Clay electorate was eligible to vote. *Id.* In addition, the exogenous elections generally covered districts within the city of Wilmington and most of the white Red Clay electorate lives in the suburban areas of the District. Considering the limited pool from which information may be gleaned and other factors testified to by Dr. Dunivant, the Court finds that the Plaintiffs have failed to establish that the exogenous elections are representative of the voting patterns of the white Red Clay electorate.

The one Red Clay election analyzed by ecological regression does show that only 1 percent of the white voters of Red Clay voted for the black candidate. The black candidate was defeated in the 1988 election. Results from one election do not show that white voters *usually* vote in a way to defeat the black voters' choice of candidate. The Court finds that the regression analysis, standing alone, does not establish that there is white bloc voting in the Red Clay elections.

#### (b) *Descriptive Techniques*

In studying the voting patterns of the white citizens of Red Clay, Dr. Lichtman studied scatterplots, extreme case results, and calculated the maximum white vote for the black candidate in the 1983 and 1985 Red Clay elections. The Court has discussed the scatterplots in the section on racial polarization *supra*. With the exception of the analysis of the 1988 Red Clay election, these scatterplots and extreme case analyses represent results from the exogenous elections. The Court has found these exogenous elections are not reliable indicators of the voting pattern of the white Red Clay electorate, therefore, the Court finds that the scatterplots and extreme case analyses of these exogenous elections cannot be relied upon to find white bloc voting in Red Clay.

Dr. Lichtman performed extreme case analyses on the 1983, 1985 and 1988 Red Clay elections. Those results are summarized in the following table:

Percentage of Vote
Cast For the Black Candidate [11]

| Election | 90%+ White Polling Places | Other Polling Places |
|---|---|---|
| 1988 | 4 | 27 |
| 1985 | 38 | 72 |
| 1983 District A | 16 | 67 |
| 1983 District D | 15 | 59. |

In order to make these calculations, Dr. Lichtman had to assume that the proportions of the white voters in those polling places in the 1983 and 1985 elections were overwhelmingly white as was the proportion of the white voters in those polling places in the 1988 election. Tr., Vol. B at 77.

In his report, Dr. Dunivant stated that such an assumption was "very suspect" because the voter turnout for these polling places ranged from 1.6 percent in 1983 to 6.9 percent in 1988. DX 42 at 22. Dr. Dunivant stated that even if it was valid to assume that the composition of the neighborhoods was the same, which he apparently was not conceding, it was not valid to assume that the turnout by race was the same in each election given the wide variety in turnout range. DX 42 at 22.

Dr. Dunivant's reasoning on this point is persuasive. The Court finds that the allegedly extreme case results reported from the 1983 and 1985 elections are not reliable because there is no substantial evidence that the racial composition of those districts has not changed in recent years. Nor is there any evidence that the turnout out by race was the same in 1983 and 1985 as it was in 1988 and 1989.

Dr. Lichtman also conducted an extreme case analysis for one additional exogenous election, the 1982 New Castle County District 1 election. Ten percent of the electorate in this exogenous election were not residents of the Red Clay School District. Dr. Lichtman testified that this election result was valuable in spite of the fact that it includes voters from outside Red Clay because a majority of the white voters of Red Clay were eligible to vote in the District 1 election. Tr., Vol. B at 106–07. Dr. Lichtman's extreme case analysis indicated that 20 percent of voters in the predominantly white districts in that election voted for the black candidate. In contrast 63 percent of the voters in the predominantly black districts, which were outside the Red Clay School District, voted for the black candidate in the District 1 election. PX 7 at 29.[12]

This analysis establishes that 80 percent of the citizens in the predominantly white districts did not vote for the black candidate. It does not, however, provide an indication of which candidate would have been the preferred candidate of black Red Clay voters. Because the Court cannot determine if the predominantly white districts are voting against the candidate which would be preferred by black Red Clay voters, the Court finds this result to be of little value in establishing white bloc voting in Red Clay elections.

Finally, Dr. Lichtman calculated the theoretical mathematical maximum of white voters who voted for the black candidates in the 1981, 1983, 1985 and 1988 Red Clay elections. He testified that the theoretical maximum of white vote for the black candidate could be calculated by assuming that every vote the black candidate received came from a white voter. Tr., Vol. B at 80. He did this calculation two different ways. One calculation assumed blacks voted in equal proportions to whites and one calculation assumed the black voter turnout was twice the white voter turnout. His results are summarized in the following table:

**11.** These results are taken from PX 7 at Table 7.

**12.** The predominantly white districts had a white population exceeding 90 percent. The predominantly black districts had a black population exceeding 70 percent.

Theoretical Maximum
White Vote For Black Candidate [13]

| Election | Equal Turnout | Black Turnout 2X White Turnout |
|---|---|---|
| 1981 Dist. A | 17% | 18% |
| 1981 Dist. B | 42% | not calculated [14] |
| 1981 Dist. E | 19% | 21% |
| 1983 Dist. A | 30% | 34% |
| 1983 Dist. D | 27% | 30% |
| 1985 Dist. B | 53% | 59% |
| 1988 Dist. A | 9% | 10%. |

Dr. Lichtman testified that the actual white vote for the black candidate was probably substantially less because this analysis assumed that no blacks voted for the black candidate and assumed black voter turnout to be equal to or greater than white voter turnout. *Id.* at 79.

The Court notes that a candidate need not receive 50 percent of the white vote to win an election in Red Clay when more than two candidates are running for a seat. Therefore, a finding of white bloc voting cannot be based upon the observation that usually less than 50 percent of the white candidates favor the black candidate. Assuming equal turnout of black and white voters, the white vote for the black candidate ranged from a low of 9 percent to a high of 53 percent. The Court finds that these varied results do not indicate a consistent pattern of whites voting against the black candidate. Furthermore, the Court is not convinced that all of these black candidates were the preferred candidates of the black community. The Voting Rights Act is designed to protect the minority voter not the minority candidate. Only the 1988 election has received extensive analysis by the experts. The lay testimony regarding the 1983 elections is contradictory. The Court finds that the expert testimony does not establish that the white citizens of Red Clay usually vote in a manner which defeats the black citizens' choice of candidate.

2. *Lay Testimony*

The lay testimony on the issue of white bloc voting focused primarily upon the exogenous elections. For example, a campaign manager testified that in one of the

exogenous elections she worked for a white candidate and attempted to target the white vote to wrest as much of it as possible from the other white candidate. Tr., Vol. A at 178–80. Because the Court has found that the exogenous elections are not reliable indications of the voting patterns of the white Red Clay electorate, lay testimony regarding these elections is also of limited usefulness.

The Court concludes that the Plaintiffs have failed to establish by a preponderance of the evidence white bloc voting in the Red Clay elections. Because the Plaintiffs have failed to prove the three *Gingles* factors, their claim must fail. In the interests of providing a comprehensive opinion, however, the Court will consider the remaining factors outlined in the Senate Report.

III. *Other Senate Factors*

A. History of Discrimination Touching Right to Vote and the Impact of Historical Discrimination in Other Areas (Senate Factors Nos. 1 & 5)

There is no evidence of official discrimination in the Red Clay School District or in New Castle County subsequent to 1970. The State of Delaware, however, like other states in the south atlantic region of the country, has a history of official discrimination against black citizens, including discrimination concerning voting. As is commonly known, most of the state was slave territory until slavery was abolished by passage of the 13th Amendment to the United States Constitution. Prior to the adoption of the 15th Amendment to the Constitution, black citizens could not vote. Del. Const. Art. 4, Sec. 1. Delaware's legislature vehemently resisted passage and enforcement of the 15th Amendment. *See, e.g.,* R. Kluger, *Simple Justice* 426 (2d ed. 1977).

Poll taxes and literacy tests were enforced to deny black citizens the right to vote. *See, e.g.,* Hancock, "Delaware, 1865–1914" at 186–817 in Reed, *Delaware: A History of the First State* (1947); Debates

---

**13.** These results are compiled from PX 7 at 43–50.

**14.** In his report, Dr. Lichtman calculated these numbers for the elections in which the black

candidate had lost and did not do the calculation for the election where the black candidate had won. During cross-examination, he calculated one of these values. PX 7 at 43–50; Tr., Vol. B at 197.

and Proceedings of the Constitutional Convention of the State of Delaware, 1896–1897 at 347. The poll tax was eliminated by amendment to the Delaware constitution in 1897. Del. Const. Art. V, Sec 2. Literacy tests were abolished in 1970 when the United States Congress suspended such tests nationwide. 42 U.S.C. § 1973aa.

■ The Court takes judicial notice that the State of Delaware has a history of public and private discrimination against blacks in many other areas including: education, housing, employment and public accommodations. For example, *de jure* segregation existed in the Delaware public schools until the Supreme Court decision of *Brown v. Board of Education* in 1954. The history of the litigation involving desegregation of the public schools in Delaware is summarized in a recent opinion, *Coalition to Save Our Children v. Board of Education*, 757 F.Supp. 328, 329–30 (D.Del.1991). Prior to the Supreme Court decision in *Brown*, blacks were also denied admission to the University of Delaware. Black students wishing to pursue graduate studies had to do so outside of the state. Johnson Depo. at 87.

Based upon the 1980 census data, one of the Plaintiffs' experts, Dr. O'Hare, testified that in 1979 and 1980, the median income of black families in New Castle County was only a little more than half of the median income of white families. He testified that approximately half of the adult black population in New Castle County had finished high school. Roughly three-quarters of the adult white population had completed high school. Twice as many white adults had completed four years of college as compared to black adults. The unemployment rate among blacks was twice the unemployment rate among whites. Over one quarter of black households did not have a car as compared to less than 10 percent of white households. Over 10 percent of black households did not have a telephone compared to approximately 2–½ percent of white households. Tr., Vol. A at 45–51.

This testimony paints a dismal picture of past discrimination in the State of Delaware and of economic disparities in New Castle County. The Court must consider whether this history of discrimination and the current economic disparity hinders the Red Clay black citizens' ability to participate in the election process. Dr. O'Hare testified that these disparities in income and education are associated with lower rates of political participation. Dr. O'Hare testified that in the November, 1988, General Election, 62 percent of the whites and 40 percent of the non-whites in the State of Delaware participated in that election. *Id.* at 54.[15] This testimony was corroborated by turnout rates in the elections studied by Dr. Lichtman. Tr., Vol. B at 159–61; PX 9. Dr. Lichtman also found that in the 1988 primary for the City of Wilmington, 28 percent of the white voting age population turned out for the election while only 14 percent of the black voting age population turned out for the election. PX 9.

Significantly, the turnouts for black and white citizens for the 1988 Red Clay election were much closer. The turnout for white voters was 7 percent of the white voting age population. The turn out for black voters was 5 percent of the black voting age population. PX 9. The Court cannot determine whether this relative equality in turnout rate is due to a generally depressed turn out of all voters or due to some of the features of the Red Clay election, such as no registration requirement or multiple polling places. The Court need not understand the cause, however, to find that the rates are roughly similar. The Court finds that any lingering effect of discrimination against blacks in Delaware is not producing a disparate turnout rate for black citizens in Red Clay elections.

The expenditures and effort necessary to mount a successful campaign in Red Clay have varied. Several successful candidates have spent less than fifty dollars of personal funds. PX 55 at Interrogatory 4; PX 59 at Interrogatory 4; PX 61 at Interrogatory 4. Other successful candidates have spent four hundred dollars or more of their personal funds. PX 60 at 4. Total expenditures for successful campaigns have

---

15. Blacks constitute 90 percent of all non-whites in Delaware. Tr., Vol. A at 54; PX–14, Table H.

ranged from one hundred dollars to two thousand five hundred dollars. PX 54 at Interrogatory 4; PX 55 at Interrogatory 4. Winning candidates have had between fifteen and one hundred twenty-five people helping them with their campaigns. PX 55 at Interrogatory 4; PX 57 at Interrogatory 4.

Although these expenditures are not insignificant, the evidence indicates that economics has not barred black citizens from running in and winning Red Clay elections. Since 1981, ten out of seventy-five, or roughly 13 percent, of the candidates running for positions on the Red Clay school board have been black. This is comparable to the percentage of black citizens in the Red Clay population. Three of these candidates have been successful. The Court finds that the vestiges of discrimination, such as differences in median income between the white and black citizens of Red Clay, do not create a significant impediment to black citizens participating in the electoral process of the Red Clay School District.

The Court concludes that although there has been official and private discrimination against black citizens in Delaware and New Castle County, the Plaintiffs have failed to show by a preponderance of the evidence that the lingering effects of this discrimination play a significant role in impeding black citizens' ability to participate in the Red Clay School Board elections.

B. Practices Enhancing the Opportunity for Discrimination (Senate Report Factor No. 3)

The parties dispute whether the features of the Red Clay election process, other than the at-large feature, enhance the opportunity for discrimination against minority citizens. The Red Clay district covers an area approximately fifteen miles wide and fifteen miles long. *See* Stipulated Exhibit ("SX") 2 at 22; SX 3. It is the second largest school district in Delaware and the largest district in New Castle County. Plaintiffs' Rebuttal Exhibit ("PRX") 18 at 4. The parties agree that the size of the district increases the expense and difficulty of campaigning in an at-large election. The Plaintiffs argue that the large district impedes black candidates more than white candidates because blacks generally have lower incomes.

While this may be a large district by Delaware standards, it is not unusually large when compared to districts in other reported section 2 cases. For example, the district in *Garza v. County of Los Angeles,* 756 F.Supp. 1298, 1341–42 (C.D.Cal.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 681, 112 L.Ed.2d 673 (1991), was twice the size of the State of Delaware. Incumbents amassed millions of dollars in contributions which required candidates to make significant financial expenditures to run a successful campaign.

In Red Clay, candidates are invited to attend "Meet the Candidates Nights" in many of the neighborhoods in the District. Church groups and neighborhood groups are active in supporting candidates for election to the School Board. *See, e.g.,* Tr., Vol. A at 82, 155. The newspaper often prints editorials and other articles regarding the elections. *See, e.g.,* PX 49; DX 39. Therefore, there are many ways for a candidate to receive exposure without expending large sums of money. The Court finds that given the community involvement in the School Board elections, the size of the election district in Red Clay is not large enough to be a source of discrimination against black citizens.

Candidates in Red Clay must run for assigned seats. This system fosters slating which has helped two black candidates win seats on the Red Clay School Board. *See* Slating section, *infra.* This system also ensures that citizens from each district within Red Clay, including the districts with large minority populations, will have representation on the School Board. The assigned post system also prevents the use of single shot voting, which does make it more difficult for minority citizens to elect the candidate of their choice. Given the beneficial and detrimental aspects of the assigned posts, the Court finds that this feature of the election system does not

clearly work in favor or against minority voters.

Candidates need only a plurality of votes to win an election in Red Clay. The Plaintiffs argue that as a practical matter, candidates rarely win with a mere plurality of votes. Given that occasionally there are elections involving multiple candidates, the Court finds that this feature will sometimes benefit minority voters. Furthermore, it clearly does not provide an opportunity for discrimination.

There is no voter registration requirement for the Red Clay elections. The Defendants argue that this factor favors minority voter participation. The Plaintiffs argue that because there is still a disparity between black and white voter turnout in Red Clay, this factor does not aid the black citizens. While this evidence will not support a finding that this feature is a cause of greater minority turnout, it is clear that this feature does not provide an opportunity for discrimination against black citizens of Red Clay.

The Plaintiffs contend that the Board's practice of holding elections on Tuesdays rather than Saturdays makes it disproportionately difficult for black citizens to vote. The Plaintiffs base this argument upon the assumption that it will be more difficult for black citizens than white citizens to leave their jobs to vote. When the elections are held on Tuesdays, the polls are open well into the evening. *See, e.g.,* SX 29 at 2, 3 (campaign literature for 1987 and 1988 races indicates that polls are open from noon until 9 p.m.). Citizens can vote at any polling place within the district. Given the hours the polls are open and the multitude of polling places in the District, the Court finds that holding Tuesday elections rather than Saturday elections does not enhance the opportunity for discrimination against black citizens.

The elections are held in May rather than in November. This generally results in a low voter turn out. The Plaintiffs argue this disproportionately affects blacks. The Court finds that the low voter turn out effects voters in an equivalent manner and does not enhance the opportunity for discrimination against black citizens.

The Court finds that on the whole, the Plaintiffs have failed to prove by a preponderance of the evidence that the features of the Red Clay election system enhance the opportunity for discrimination against black citizens.

### C. Slating (Senate Factor No. 4)

Several informal slating processes have operated in the Red Clay elections. For example, in the first Red Clay elections, the successful black candidate was included on an informal slate with several white candidates. Tr., Vol. G at 4. Since 1985, slating has been organized around the feeder pattern issue. Tr., Vol. D at 7. Jackson Depo. at 90. A group called "Citizens United for Education" has supported candidates who favored feeder pattern changes. Its membership is predominantly, although not exclusively white. Jenkins Depo. at 5, 26, 59. "Neighborhoods Working Together", another slating group, supported candidates who oppose mandatory feeder pattern changes. Tr., Vol. G at 29–35, 65. Some of its members supported the successful black candidate in the 1990 election. *Id.* at 6, 40–42. The Coalition to Save Our Children has a predominantly black membership. Although it does not raise funds for elections, it is active in Red Clay school board elections. Tr., Vol. A at 66–68, 71–72; Vol. C at 10–11, 157; Vol. D at 17. The Coalition has endorsed candidates and worked to get the vote out in the black community. Roberts Depo. at 15.

The Plaintiffs suggest the slating system in Red Clay has been closed to black candidates because the membership in "Neighborhoods Working Together" and "Citizens United for Education" is predominantly white and these organizations did not sponsor a black candidate until after this lawsuit was initiated. The Plaintiffs also argue that the Coalition to Save Our Children is at a disadvantage as a slating organization because it does not have campaign funds.

In a district that is approximately 87 percent white, it is not surprising that

many neighborhood organizations are predominantly white. The racial composition of a group, standing alone, will not support an inference that the group excluded black citizens. Despite the Plaintiffs' arguments, there is evidence in the record showing that black candidates have been slated with white candidates in 1981 and 1990. The evidence will not support a finding that the pending lawsuit influenced the 1990 slate. Nor is there any evidence to suggest that a black candidate asked for and was denied access to a slate in any other year. As the Court has previously discussed, the availability of funds is an important but not conclusive factor in the Red Clay elections. The Court finds that the Plaintiffs have failed to prove by a preponderance of the evidence that black candidates were denied access to slating processes in Red Clay.

D. Overt or Subtle Racial Appeals in Campaigns (Senate Factor No. 6)

The Plaintiffs rely on three pieces of evidence to support their argument that the elections in Red Clay contained racial appeals: two newspaper articles from 1985, PX 37, PX 38, and a campaign flyer from 1988, SX 29 at 7. The Defendants deny that the articles and the flyer constitute credible evidence of racial appeals.

A newspaper article dated May 6, 1985, published pictures of the candidates and stated that race may be an issue in the 1985 election. It identified Roberts as the only black board member on the Red Clay School board and quoted Roberts as saying that he was concerned that the black vote might be split between Amos, another black candidate and himself. This would allow Eckman, the white candidate, to win the election. PX 37 at 3.

A newspaper article dated May 12, 1985 indicated that Roberts had lost the election and stated that: "Because Roberts is black and Eckman is white, race became an issue in the election." PX 38 at 2.

Certainly, the May 6, 1985, article can hardly be used to establish racial appeal. The second article, in the absence of more, is a conclusory statement without foundation in the record. Even accepting it as fact proves very little. Furthermore, although a court has considered newspaper articles to make a finding of racial appeals in *Williams v. Dallas*, 734 F.Supp. 1317 (N.D.Tex.1990), the rationale relied upon by that court does not fit the facts in the present case. In a footnote, the *Williams* court cited a law journal article, stating that:

> *racial appeals* occur in a campaign if one candidate calls attention to the race of his opponent or his opponents's supporters (e.g., where a white candidate uses a picture of his black opponent in his own campaign material)—or if media covering a campaign disproportionately call attention to the race of one candidate or that candidate's supporters (e.g., "racial telegraphing" by contrasting a white "civic leader" against a "black activist" opponent).

*Williams*, 734 F.Supp. at 1360 n. 119 (emphasis in original) (quoting Grofman, Migalski and Noviello, *"The 'Totality of Circumstances Test' in Section 2 of the 1982 Extension of the Voting Rights Act: A Social Science Perspective"*, 7 Law & Policy 199, 214 (April 1985).

In the newspaper articles the black and white candidates are not referred to in any disparaging manner and not in a way that could be described as decisive, such as civic leader or activist. To the extent that either candidate is making an issue of race, it appears that the subject was brought up by Roberts, one of the black candidates and a named Plaintiff in this lawsuit. The Court does not find this to be the type of evidence of racial appeals that was before the court in *Williams*.

The third piece of evidence is a flyer from the 1988 election for district A. In that election, one candidate opposed feeder pattern changes and the other two candidates favored feeder pattern changes. Two of the candidates were white and one was black. The flyer states in pertinent part:

SKYLINE IS OVERCROWDED, STANTON IS OVERCROWDED, HERITAGE IS OVERCROWDED, WARNER

IS OVERCROWDED, AND TO TOP IT ALL OFF, DICKINSON AND MCKEAN ARE GROWING MORE WHITE AND WILMINGTON HIGH IS BEGGING FOR WHITE STUDENTS.

ROBERT MITCHELL HAS SAID OVER AND OVER AGAIN THAT HE WILL DO ANYTHING TO GET MORE STUDENTS TO ATTEND WILMINGTON HIGH. HE DOESN'T CARE WHERE THEY COME FROM. THIS MEANS FEEDER PATTERN CHANGES! J.J. NUTTALL FAVORS WIDE–SPREAD FEEDER PATTERN CHANGES ALSO. HE, TOO, DOESN'T CARE WHERE THE STUDENTS COME FROM. BOTH KNOW THAT THE NEW DEVELOPMENTS LIE WITHIN OUR FEEDER PATTERN. THE PERCENTAGE OF *MINORITIES AT A.I. DUPONT* HIGH IS *24% AND INCREASING*, AT *MC KEAN IT'S 27% AND FALLING* AND AT *DICKINSON IT'S 34% AND FALLING. DON'T BE MISLED* INTO THINKING THAT MCKEAN AND DICKINSON WOULDN'T BE CALLED UPON FOR FEEDER PATTERN CHANGES— THEY WOULD, AND THE RESULT WOULD BE *MAJOR DISRUPTION* FOR OUR CHILDREN!!!

*BILL MANNING* IS THE ONLY CANDIDATE WHO HAS SAID OVER AND OVER AGAIN THAT HE *FAVORS STABILITY.* TO DEAL WITH OVERCROWDING, HE SUPPORTS CHANGE WITHIN OUR SAME FEEDERS, KEEPING OUR CHILDREN TOGETHER. TO DEAL WITH RACIAL DIFFERENCES, HE FAVORS PROGRAMS TO ATTRACT STUDENTS BACK INTO THE PUBLIC SCHOOLS WITHIN THEIR FEEDER. HE FEELS THAT MAKING FEEDER PATTERN CHANGES IS THE LEAST CREATIVE AND MOST DISRUPTIVE SOLUTION TO THE DISTRICT'S PROBLEM.

SX 29 at 7 (emphasis in original).

The Plaintiffs argue that the flyer is evidence of a racial appeal because it is harsher on the black candidate than the white candidate. The Plaintiffs also argue that the appeals like the one in the flyer tend to incite racial fears to the detriment of minorities. Manning stated that he did not learn of the flyer until after the election and would not have approved of it because he believed it misled voters about his opponents' positions and was acrimonious. Manning Depo. at 77–78.

The flyer uses words like white and minority. It would be difficult, however, to talk about the feeder pattern issue without using such terms. The flyer is addressing an issue that is a major concern to black and white residents in the Red Clay School District. Although the tone of the flyer is shrill, it does not malign one of the candidates or his supporters because of race. Without knowing the race of the candidates, a voter reading the flyer would not be able to determine that Mitchell was black and Nuttall and Manning were white. The Court disagrees with the Plaintiffs' characterization of the flyer. The flyer may be misleading or acrimonious but the Court finds no evidence of overt or subtle racial appeal in the flyer.

Because the Court can find no credible evidence of subtle or overt racial appeals in the three pieces of evidence submitted by the Plaintiffs on this issue, the Court finds that the Plaintiffs have failed to prove by a preponderance of the evidence that there have been overt or subtle racial appeals in the Red Clay School District Elections.

E. Tenuousness of Policy Supporting At–Large Voting (Additional Senate Report Factor)

The at-large election method was established by the State Board of Education with Court approval. D.I. 84, ¶¶ 5, 6. With the exception of the Indian River School District, every district in the state elects board members in at-large elections. D.I. 84, ¶ 6. There have been at least three attempts to legislatively change the at-large system of election to a single member system. *See* SX 26; SX 27; SX 28. These attempts have failed.

In March of 1989 the State Department of Public Instruction published a study of school board election laws in Delaware. A majority of the study committee favored

maintaining the at-large method of election. PX 35 at 10. The study identified two arguments favoring at-large elections. In theory, board members elected at-large need votes from every neighborhood and are accountable to all voters not just voters from their nominating districts. At-large elections also allow voters to vote each year rather than every fifth year. *Id.*

The Plaintiffs argue that the at-large system is tenuous because there is a school district in Delaware which elects board members from single districts. The Plaintiffs also argue that the policy is tenuous because most of the members of the New Castle County Council are elected from single-member districts and the members of the Wilmington City Council are elected from a combination of single-member and at-large districts. D.I. 84, ¶ 47.

The Court does not find the Plaintiffs' arguments persuasive. The fact that one of sixteen school districts elects their board members from single member districts does not rebut the policies outlined in the report. This is especially true when the Court has been given no evidence of similarities or differences between the Indian River District and the Red Clay District. The Court finds no similarities between the County or City Council and the Red Clay School District which suggest that the County and City election systems are proof that the District election system is tenuous.

The Delaware legislature has repeatedly considered the at-large election system used in the schools in Delaware. Specific policies supporting the at-large elections have been identified. Reasonable minds may differ about whether or not the at-large election system fosters the policies outlined by the state. Such disagreement, however, does not equate to a finding of tenuousness. The Court finds that the Plaintiffs have failed to prove by a preponderance of the evidence that the policies supporting the at-large election system in Red Clay are tenuous.

F. Responsiveness to Minority Concerns (additional Senate Report Factor)

The Plaintiffs contend that the Board has been unresponsive to minority concerns. They cite the findings in *Coalition to Save Our Children,* 757 F.Supp. at 342–46, 354–58, to support their position that the Board has acted to alleviate the racial imbalance in Red Clay Schools only after repeated prodding and a direct order from the State Board. The Plaintiffs also argue that the Board has failed to respond to certain "substantive concerns", such as high rates of suspensions and assignment to special education among black students, low test score performance by black students, high drop out rate of black students, and low college matriculation among black students. The Plaintiffs contend that it has been difficult for members of the Coalition to meet with the Board to discuss their concerns. They argue that many of the Board members cannot identify with concerns of the black community and this is an indication of a lack of responsiveness.

The Defendants insist that the Board has been responsive to minorities. They argue that from its inception in 1981, there have been members on the Board who have been effective advocates for minority concerns. The Defendants note that black professionals have been hired in key leadership positions in Red Clay. For example both of the superintendents for the District have been black. The percentage of black teachers, principals and other professionals on the staff generally exceeds the percentage of black population in the District. DX 27; Tr., Vol. C at 85–90. The current director of special services is also black. The Defendants contend that the Board has given a great deal of attention to the overcrowding and racial balance issues but has disagreed with the Plaintiffs on how to resolve these issues. The Defendants contend that the substantive concerns identified by the Coalition are not due to discrimination by the Board and the District is giving special attention to these problems.

The evidence presented at trial established that while changing feeder patterns in the abstract was not too controversial, each particular plan was unpopular, drawing criticism from both minority and white

citizens. Tr., Vol. C at 139–43. Dr. Johnson, the superintendent of the District at that time, informed the Board as early as 1984 that the overcrowding and racial imbalance in the schools was becoming so severe that it would require some board action, probably feeder pattern changes, in order to correct the problem. D.I. 84, ¶ 31. Neither the initial plan proposed by Dr. Johnson nor the amended plans he proposed were adopted by the Board. *Id.,* ¶ 32.

In 1985, a citizen committee, Building Utilization Advisory Committee ("BUAC"), was established by the Board to study the problem. *Id.,* ¶ 33. During 1985 and 1986, BUAC developed many options for feeder pattern changes. Two of the plans were supported by a majority of the committee members. Neither plan received a majority of Board support. *Id.,* ¶ 34.

In 1988, the use of a magnet school plan to promote voluntary student movement was proposed by the Board. The State Board of Education did not approve of the idea. *Id.,* ¶ 37. In May of 1989, the State Board of Education sent a letter to the Red Clay School District insisting that the racial composition disparities of the schools be corrected by the fall of 1991. *Id.,* ¶ 39. Beginning in September of 1990, the Red Clay School Board advanced several versions of its CHOICE plan to the State Board of education. The Red Clay School Board unanimously supported these plans. *Id.,* ¶ 41. A version of this plan, modified by the Delaware State Board of Education and the Federal District Court was eventually approved by Court Order in February, 1991.[16]

Thus, it has taken the Board seven years to develop a plan which may solve the problem of racially identifiable schools within the District. The Court realizes that the Board's decision was a difficult one. The Court finds, however, that the seven year time lag on an issue which is of extreme importance to the black community is indicative of a lack of responsiveness to minority concerns.

With regard to the "substantive concerns" of the Coalition, there was no evidence at trial to suggest that black students were being placed in special education programs on a discriminatory basis. The Director of Special Services testified that he has been working to lower the number of black students who are placed in special education. His efforts have included ensuring the staff is properly trained so that students are not inappropriately placed in special education. Tr., Vol. C at 123. Nor was there any evidence at trial to suggest that a Board policy was the source of the disproportionate suspensions, high absenteeism or low test scores of black students. Although the Plaintiffs' list of substantive concerns paint a disparaging picture of the state of education in the Red Clay School District, the Plaintiffs have failed to introduce enough evidence to show that the Board is unresponsive to these concerns.

Plaintiffs' argument that the Board's reluctance to meet with the Coalition is evidence of the Board's insensitivity to minority concerns is not persuasive. The Court heard testimony that the Plaintiffs rarely attended regularly scheduled public meetings of the Board. Instead, they sought and attended private, specially scheduled meetings between the Coalition and the Board in order to express their concerns. Tr., Vol. G at 59–60. The failure of the Plaintiffs to use the public meetings as a mechanism of communication with the Board makes it difficult for the Court to find that the Board was unresponsive because it did not schedule as many special meetings with the Coalition as the Plaintiffs thought appropriate.

The Court finds that certain individual Board members have been strong advocates for minority concerns. Several of the Board members, however, testified that they did not know whether or not Delaware had operated segregated schools or whether there was a history of discrimination against blacks in Delaware. Tr., Vol. C at 19–20. Other board members were unfamiliar with the substantive concerns ex-

**16.** In the absence of federal funding, it could     not be implemented.

pressed by the coalition. Allen Depo. at 27; Manning Depo. at 41–42. While a Board could be responsive to the current concerns of minority citizens without an awareness of the past problems of the minority groups, the Court believes it would be difficult for Board members to remain ignorant of current minority concerns if the Board were actively attempting to meet those concerns. Therefore, the Court finds that the inability of individual board members to identify issues of current concern to the minority community indicates a lack of responsiveness by the Board.

The Court finds that the Plaintiffs have established by a preponderance of the evidence that the Board has not been responsive to certain concerns of the minority community.

## IV. *The Totality of the Circumstances*

The Court is troubled by the Plaintiffs' evidence that the Board has been unresponsive to the needs of minority students in the Red Clay School District. The Court understands that moving children is a controversial and difficult issue to resolve. It is the responsibility of the Board, however, to make the difficult decisions which are necessary to ensure that all children in the District have access to an equal education. The Board's hesitance to make the difficult decisions in the period from 1984 through the present has been the fuel for continuing litigation in the desegregation suit. The Court suspects the Plaintiffs' frustration with the Board regarding the growing racial imbalance in the schools and the "substantive issues" identified by the Coalition have played an important part in this litigation as well.

The concerns of the Plaintiff Class are for the most part legitimate concerns but they are not concerns that, for the most part, can be accomplished through the application of the Voting Rights Act. In sum, the record in this case does not support a violation of that Act. The evidence relating to some elements of the charge were compelling but, more importantly, in other respects, it was woefully weak. There is no long history of a failure of black candidates to be elected to the Board. There is not evidence that black candidates have been denied access to the informal slating processes in the District. The election system was not set up with any intent to dilute the minority vote. The reasons for the at-large election system are not tenuous. Finally, the other features of the election system do not offer an opportunity for discrimination against black voters. The timing of this law suit may very well have been the crucial factor in the Court's decision because it was the available evidence which failed to sustain Plaintiffs' burden of proof.

Even if the Court had concluded that the Plaintiffs had satisfied the three *Gingles* factors, the Plaintiffs have not established a violation when the totality of the circumstances are considered. The Court concludes that the Plaintiffs have failed to establish that the current system of at-large elections to the Red Clay School Board violates Section 2 of the Voting Rights Act.