

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-18-1997

# Jenkins v. Reinbold

Precedential or Non-Precedential:

Docket 96-7313

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Jenkins v. Reinbold" (1997). *1997 Decisions.* Paper 133.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/133

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed June 18, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-7313

ALDEN JENKINS; GWENDOLYN NEAL;
HARLAN ROBERTS,

Appellants

v.

WILLIAM E. MANNING; CAROLECE SCOTTON; IRWIN J.
BECNEL, JR.; CHARLES M. CAVANAUGH; LORETTA C.
RICE; EDWARD M. SOSNOWSKI; JACQUELINE WITT;
RED CLAY CONSOLIDATED SCHOOL DISTRICT BOARD
OF EDUCATION

On Appeal from the United States District Court
for the District of Delaware
(D.C. Civ. No. 89-00230)

Argued April 17, 1997

BEFORE: GREENBERG, ALITO, and ROSENN,
Circuit Judges

(Filed: June 18, 1997)

Gary W. Aber
Heiman, Aber & Goldlust
First Federal Plaza
702 King Street
P.O. Box 1675, Suite 600
Wilmington, DE 19801

Brenda Wright (Argued)
Samuel L. Walters
Todd A. Cox
Lawyers Committee for Civil
Rights
1450 G. Street, N.W.
Suite 400
Washington, DC 20005

 Attorneys for Appellants

Thomas J. Manley (Argued)
Albert Diaz
Hunton & Williams
One Hanover Square
Fayetteville Street Mall
Suite 1400
Raleigh, NC 27601

Alfred D'Angelo, Jr.
Pepper, Hamilton & Scheetz
1201 Market Street Suite 1600
Wilmington, DE 19801

 Attorneys for Appellees

**OPINION OF THE COURT**

GREENBERG, Circuit Judge.

Appellants, Alden Jenkins, Gwendolyn Neal, and Harlan Roberts, appeal from a judgment entered in favor of appellees, the Red Clay Consolidated School District Board of Education ("The Board") in Delaware and the individual

Board members,1 finding that the at-large system of electing Board members does not violate Section 2 of the Voting Rights Act. The district court's conclusion that appellants failed to establish a section 2 violation was not clearly erroneous, and its legal conclusions were sound. Therefore, we will affirm.

## I. JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 42 U.S.C. § 1973j(f). We have jurisdiction over this timely filed appeal under 28 U.S.C. § 1291.

Section 2 cases present mixed questions of law and fact, so our review of the district court's legal analysis is plenary, but our review of the court's factual findings is governed by the clearly erroneous standard. Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ., 4 F.3d 1103, 1116-17 (3d Cir. 1993), cert. denied, 512 U.S. 1252, 114 S.Ct. 2779 (1994) ("Jenkins II"). "[I]t is this combination of factual deference and legal review that best `preserves the benefit of the trial court's particular familiarity with the indigenous political reality without endangering the rule of law.' " Id. at 1117 (citation omitted); see also Ortiz v. City of Philadelphia Office of City Com'rs Registration Div., 28 F.3d 306, 308-09 (3d Cir. 1994).

If there is some evidence to support a district court's findings, a reviewing court can conclude that thefindings are clearly erroneous only when " `the reviewing court on the entire evidence is left with the definite andfirm conviction that a mistake has been committed.' " Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511 (1985) (citation omitted). A reviewing court, however, may not substitute its own view of the weight of the evidence for that of the district court if the district court's findings represent a plausible reading of the evidence. Id. at 573-74, 105 S.Ct. at 1511.

---

1. The individual named appellees are William E. Manning, Carolece Scotton, Irwin J. Becnel, Jr., Charles M. Cavanaugh, Loretta C. Rice, Edward M. Sosnowski, and Jacqueline Witt.

3

II. FACTUAL AND PROCEDURAL HISTORY

The appellants filed this case as a class action on behalf of all eligible black voters in the Red Clay School District to challenge the method of electing members to the Red Clay Board of Education. Appellants charged that the at-large electoral system "unlawfully dilutes the voting strength of black citizens and has the effect of providing black citizens in the Red Clay School District less opportunity than white citizens to participate in the political process and to elect candidates of their choice to the Red Clay Board of Education." Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ., 780 F. Supp. 221, 221-22 (D. Del. 1991) ("Jenkins I"), rev'd, Jenkins II, 4 F.3d 1103.

The Red Clay School District was established in November 1980. The Board has seven seats; each member sits for a five-year term, and elections are staggered so that each year there are elections for one or two seats. The first election was held in January 1981; since then, elections have been held annually in May. Candidates for the Board only must obtain the signatures of 20 voters to run for the Board.

The Red Clay electoral system is characterized as an at-large or multi-member district system. Jenkins I, 780 F. Supp. at 222. "In Red Clay, there is an assigned-post system, and only candidates living in a particular district may run for that particular district's seat. All Red Clay voters, however, can vote for each seat." Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Ed., 1996 WL 172327, at *21 (D. Del. 1996) ("Jenkins III"). Each voter may vote for one candidate from each particular district, which is called a nominating district, and the candidate in each nominating district receiving a plurality of the votes wins. Jenkins I, 780 F. Supp. at 222. Thus, the system, though providing for representation on the Board from each of seven defined nominating districts, does so on the basis of at-large voting. This voting plan is at the heart of this controversy.

The Supreme Court has "long recognized that. . . at-large voting schemes may `operate to minimize or cancel out the voting strength of racial [minorities in] the voting population.' " Thornburg v. Gingles, 478 U.S. 30, 47-48, 106

S.Ct. 2752, 2764-65 (1986) (citations, footnote, and internal quotation marks omitted). The danger inherent in at-large voting systems is that the majority, based on its greater numbers, will be able to elect its chosen candidates and defeat the candidates preferred by the minority. Id. at 48, 106 S.Ct. at 2765. Gingles has become a guiding case under the Voting Rights Act.

Following a bench trial, the district court concluded that appellants failed to establish one of three necessary factors to support their case under Gingles, namely, legally significant white bloc voting. Nonetheless, to make a comprehensive record, the court also analyzed the at-large electoral system under the totality of the circumstances. Jenkins I, 780 F. Supp. at 233. The court concluded that even if the appellants had established the three threshold factors, including white bloc voting, necessary to obtain relief under Gingles, under the totality of the circumstances they failed to prove a violation of Section 2 of the Voting Rights Act. Id. at 241.

Appellants appealed the district court's decision to this court, and we reversed and remanded for further proceedings. Jenkins II, 4 F.3d 1103. We held that the district court erred in its assessment of the effects of white bloc voting. Only one candidate ever won a Red Clay Education Board election with a plurality of the vote; we found this single election insufficient to support the district court's finding that the plurality-win rule enables minority-preferred candidates to overcome white bloc voting. Id. at 1122-23. We explained that the district court improperly based its assessment on the potential, rather than the actual, effects of plurality voting on the ability of black voters to elect their chosen representatives. Id. at 1123. Because we had "no way of knowing what conclusions the district court would have arrived at in regards to white bloc voting had it not been laboring under its misperception as to the significance of Red Clay's plurality voting scheme," we remanded the case to the district court for reconsideration. Id.

On remand, the district court admitted additional evidence and ultimately concluded that although the appellants had demonstrated the presence of the three

5

threshold Gingles factors, they had not established under the totality of the circumstances that there had been a section 2 violation. Jenkins III, 1996 WL 172327. The appellants then appealed again.

III. DISCUSSION

Section 2 of the Voting Rights Act provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973(b)(f)(2) of this title. . . .

(b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973. "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." Gingles, 478 U.S. at 47, 106 S.Ct. at 2764. In the legislative history to the 1982 amendments to the Voting Rights Act, the Senate enumerated several factors ("the Senate Report factors")

6

that might be relevant to an evaluation of challenges made under section 2:

To establish a violation, plaintiffs could show a variety of factors, depending upon the kind of rule, practice, or procedure called into question. Typical factors include:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

7

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

1982 U.S.C.C.A.N. 177, 206-07 (footnotes omitted). According to the Senate Report, there is no magical number of factors which must be shown to exist; "the question whether the political processes are `equally open' depends upon a searching practical evaluation of the `past and present reality.' " Id. at 207-08 (footnote omitted). Additionally, the Senate Report noted that "Section 2, as amended, adopts the functional view of `political process. . . .' " Id. at 208 n.120. See also Gingles, 478 U.S. at 45, 106 S.Ct. at 2763-64; Jenkins II, 4 F.3d at 1115.

A plaintiff must establish three elements before he or she can demonstrate that minority voters have been deprived of the opportunity to elect representatives of their choosing in violation of Section 2. These factors, to which we alluded above, have come to be known as the "Gingles factors":

First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. . . . Second, the minority group must be able to show that it is politically cohesive. . . . Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it -- in the absence of special circumstances, such as the minority candidate running unopposed. . . usually to defeat the minority's preferred candidate.

Gingles, 478 U.S. at 50-51, 106 S.Ct. at 2766-67 (footnotes and citations omitted). See also Reno v. Bossier Parish Sch. Bd., 117 S.Ct. 1491, 1498 (1997).

The Supreme Court viewed the Gingles factors as "necessary preconditions," id. at 50, 106 S.Ct. at 2766, to finding a section 2 violation but also noted the importance of the other factors enumerated in the Senate Report. Indeed, the Supreme Court and the courts of appeals continuously have reiterated that the Gingles factors are necessary, but not sufficient, preconditions to a successful section 2 challenge. Johnson v. De Grandy, 512 U.S. 997,

8

1011, 114 S.Ct. 2647, 2657 (1994); Jenkins II, 4 F.3d at 1115; Uno v. City of Holyoke, 72 F.3d 973, 980 (1st Cir. 1995); N.A.A.C.P., Inc. v. City of Niagara Falls, 65 F.3d 1002, 1019 (2d Cir. 1995); Baird v. Consolidated City of Indianapolis, 976 F.2d 357, 359 (7th Cir. 1992). The two most important Senate Report factors are " `the extent to which minority group members have been elected to public office in the jurisdiction' and the `extent to which voting in the elections of the state or political subdivision is racially polarized.' " Gingles, 478 U.S. at 48 n.15, 106 S.Ct. at 2766 n.15 (citations omitted).

The Supreme Court recently has refined the processes for evaluating Section 2 claims. "In a § 2 vote dilution suit, along with determining whether the Gingles preconditions are met and whether the totality of the circumstances supports a finding of liability, a court mustfind a reasonable alternative practice as a benchmark against which to measure the existing voting practice." Holder v. Hall, 512 U.S. 874, 880, 114 S.Ct. 2581, 2585 (1994) (footnote and citation omitted); see also Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist., #1, 56 F.3d 904, 910 (8th Cir. 1995).

We addressed Gingles in Jenkins II, where we emphasized that:

The ultimate determination under § 2 remains whether, under the totality of the circumstances, the multimember districting scheme at issue in this case deprived black voters of an equal opportunity to participate in the political process and to elect representatives of their choice. . . . Therefore, even after a court has determined that the plaintiffs proved each of the Gingles factors, it must go on to consider whether the totality of circumstances, evaluated under a searching practical evaluation of the past and present reality and a functional view of political process, establishes that the particular voting scheme diminishes the minority group's opportunity fully to participate in the political process.

Jenkins II, 4 F.3d at 1115-16 (citations and internal quotation marks omitted). We opined that it would be the

9

unusual case where the plaintiffs proved the Gingles factors yet could not prove a section 2 violation under the totality of the circumstances, but we did not foreclose the possibility that such a case could arise. Id. at 1116 n.6. See also Little Rock Sch. Dist. 56 F.3d 904 (court assumed existence of Gingles factors but found no violation established under totality of circumstances); Niagara Falls, 65 F.3d 1002 (Gingles factors established, but no violation under totality of the circumstances).

According to the district court, this case is such an unusual case. On remand, the district court addressed only the third Gingles factor, the existence and effect of white bloc voting, reasoning that we had affirmed its prior findings that the appellants had satisfied the other Gingles factors. Jenkins III, 1996 WL 172327, at *2. Using a three-step inquiry to analyze whether white bloc voting defeats minority preferred candidates in Red Clay, the district court "(1) identif[ied] which candidates were minority-preferred; (2) observe[d] whether the percentage of whites voting as a bloc against the minority-preferred candidate has been sufficient usually to defeat the minority-preferred candidate; and (3) decide[d] whether any of the elections involved special circumstances." Id. at *3 (footnote omitted).

The district court found that five out of 11 minority-preferred candidates won their elections. Id. at *9. After considering whether the victories of minority-preferred candidates could be attributed to special circumstances, the district court concluded that "white voters usually vote as a bloc against the minority-preferred candidate when that candidate is black and there is a white candidate in the race. This bloc is large enough usually to defeat black minority-preferred candidates. In these circumstances, the court finds legally significant, although not overwhelming, white bloc voting." Id. at *18.

Finding that appellants satisfied the three Gingles factors,2 the district court then assessed the Senate Report factors. As we will discuss in more detail below, the district court addressed each factor individually, finding that some

_____

2. The appellees do not challenge this finding on appeal and, of course, the appellants accept it.

10

supported the appellants' claim while others weighed against finding a violation of Section 2. The court concluded that under the totality of the circumstances, the appellants failed to establish a section 2 violation.

Appellants contend that this conclusion was in error and argue that the district court improperly weighed the various Senate Report factors in its analysis of the totality of the circumstances. The Board responds that the court's analysis was proper and also argues that the district court's conclusions are bolstered by the fact that the black voting population consistently has elected 10% black and 20% minority-preferred candidates to the Board, a figure commensurate with the 13% black representation in the voting age population.

During the initial appeal, we rejected the Board's argument that even if all the Gingles factors had been satisfied, the district court's analysis supported a finding that under the totality of the circumstances, no violation was established. First, we found that the district court's evaluation of the totality of the circumstances was tainted by its finding that the plurality-win rule combated the potential effects of white bloc voting. Jenkins II, 4 F.3d at 1135. Second, we concluded that the district court's analysis was conclusory and did not comport with the requirement that the totality of the circumstances be subject to " `a searching practical evaluation.' " Id. (citation omitted). Third, even if a less searching evaluation were permitted, we required the district court to provide a more detailed explanation of its findings and analysis. Id.

On remand, the district court corrected these errors. First, it discarded its plurality-win theory and reevaluated the elections to determine whether legally significant white bloc voting was established. Jenkins III, 1996 WL 172327, at *15. Thus, the plurality-win theory did not taint its findings on the remand. Second, the district court engaged in the more detailed evaluation contemplated by the Senate Report and the case law as we required in Jenkins II. Finally, the district court provided detailed explanations of its findings and analysis.

As on the first appeal, the parties' dispute focuses on the findings related to white bloc voting. This time, however,

11

the disagreement centers not on the finding that the appellants established the third Gingles factor, but on how the district court's finding of legally significant white bloc voting influenced its other findings. Specifically, the parties dispute the weight to be accorded the electoral success of black candidates in the analysis of the totality of the circumstances.

1. Significance of Proportional Representation and Minority Electoral Success

In finding that appellants did not establish a Section 2 violation, the district court relied in large part on the undeniably substantial success of minority candidates. Nevertheless, proportionality of representation, or the lack thereof, though relevant, is not dispositive either in proving or disproving a section 2 claim. See, e.g., Little Rock Sch. Dist., 56 F.3d at 911-912 (citing Johnson v. De Grandy); Harvell v. Blytheville Sch. Dist. #5, 71 F.3d 1382, 1388 (8th Cir. 1995), cert. denied, 116 S.Ct. 1876 (1996).3

In Jenkins II, we rejected the Board's argument that the consistent proportional representation of blacks on the Board should defeat the section 2 claim. Jenkins II, 4 F.3d at 1131-32. We viewed the district court's findings that some of the black electoral victories were the product of special circumstances and its decision to consider the Gingles factors

as a finding that the black voters of Red Clay had not achieved the persistent proportional representation discussed in Gingles that would defeat a § 2 claim at the threshold and thereby obviate the need to consider the Gingles factors. We conclude that the court's finding in this regard was not clearly erroneous as the

_____

3. These cases rely on Johnson v. De Grandy for support. However, the court in Johnson v. De Grandy was addressing a different sort of proportionality when it found that proportionality is relevant but not dispositive. As used there, the term "link[ed] the number of majority-minority voting districts to minority members' share of the relevant population. The concept is distinct from the subject of the proportional representation clause of 2. . . ." Johnson v. De Grandy, 512 U.S. at 1014 n.11, 114 S.Ct. at 2658 n.11.

12

record amply supports a finding that the black voters of Red Clay have not achieved persistent proportional representation.

Id. at 1132.

On remand, the district court reassessed its earlier finding that black candidates had achieved substantial electoral success, but not sustained proportional representation, in light of its new findings that two white candidates who were elected to the Board also were minority-preferred. Jenkins III, 1996 WL 172327, at *24. The district court based its finding of substantial minority electoral success on several elections. First, the district court counted the 1981 victory of black candidate Harlan Roberts, who won a plurality of the votes in an election of seven candidates. The district court also found that black candidate Carolece Scotton's 1990 defeat of black candidate Rita Shockley demonstrated minority electoral success. Id. at *24. In 1991, black candidate Ronald Greene defeated white candidate Russell Fiske; the court also considered this election in its evaluation of minority electoral success. Id.

The district court included in its evaluation the electoral victories of two white candidates, Charles Cavanaugh in 1988 and Patricia Reinbold in 1989, whom it deemed minority-preferred. Appellants argue that although the district court did not allow these elections to defeat its finding of legally significant white bloc voting, it improperly weighed those elections in finding substantial minority electoral success. Appellants also claim that these candidates should not have been considered minority-preferred.

In Jenkins II, we rejected a bright-line rule that any minority candidate should be viewed as minority-preferred and explained that although there is an inference that a minority candidate is minority-preferred, plaintiffs must provide evidence, such as statistical evidence regarding voting patterns or lay testimony, demonstrating that the candidate is, in fact, minority-preferred. Jenkins II, 4 F.3d at 1126. Similarly, we refused to propound a rule that only minority candidates may be considered minority-preferred.

13

Id. at 1126. Instead, we adopted a more flexible approach, emphasizing that courts must examine closely the nature of minority voter support for candidates, especially white candidates, to determine whether a particular candidate is minority-preferred. Id. at 1125-26 (citing Sanchez v. Bond, 875 F.2d 1488, 1494-96 (10th Cir. 1989)).

We enumerated several inquiries pertinent to determining whether a particular white candidate is minority-preferred. "One relevant consideration is the extent to which the minority community can be said to have sponsored the candidate." Jenkins II, 4 F.3d at 1129. An evaluation of that factor should focus on "the level of minority involvement in initially advancing the particular candidate and in conducting or financing that candidate's campaign." Id. The level of attention the candidate gave to minority needs and interests, including how often the candidate campaigned in predominantly minority areas, is also relevant. Id. at 1129. We also found pertinent the level of minority voter turn out in white-white elections, compared to the turn out when a black candidate is running. Id. "Finally, bearing in mind the disincentives that may exist for minority candidates to seek office, the extent to which minority candidates have run for office and the ease or difficulty with which a minority candidate can qualify to run for office may be relevant considerations." Id. We now examine individual elections.

a. Election of Harlan Roberts in 1981

The election of Harlan Roberts in 1981 has been a matter of some controversy during this litigation. Roberts is the only candidate ever elected to the Board by a plurality of the votes. The district court, considering the "practical effect" of the plurality-win rule in assessing minority electoral success, relied on this unusual election to support its finding of substantial black electoral success. Jenkins III, 1996 WL 172327, at *23.

In Jenkins II, we accepted the district court's original finding that the Roberts victory occurred under special circumstances. Jenkins II, 4 F.3d at 1122-23, 1132. The district court's conclusion on remand that special circumstances were not at work in this election was based

14

on its finding that Roberts enjoyed substantial white and black support and its conviction that the victory should not be discounted simply because the plurality system contributed to Roberts' victory. Jenkins III, 1996 WL 172327, at *15. This finding was clearly erroneous; this election involved the largest field of candidates ever to run for a single Board seat, id. at *14; it was the first Board election ever held, and Roberts was the only candidate ever to have won with a plurality of the vote, Jenkins II, 4 F.3d at 1122-23.

However, this error does not require reversal and remand to the district court for yet another assessment of this case. Although the district court should have discounted the effect of this victory in its analysis of minority electoral success, the fact remains that a black candidate was elected. This election still should be counted, although it should be accorded less weight. Thus, although the district court erred in its analysis of this race, this error does not upset the overall evaluation of minority electoral success. Rather, we must look to the other races considered in the district court's analysis to determine whether the error is reversible.

b. Carolece Scotton's Election in 1990

The district court found that there were special circumstances in this election because it was between two black candidates. The court therefore found the election less probative on the question of white bloc voting. Jenkins III, 1996 WL 172327, at *17. Appellants urge that the district court erred by failing to consider this special circumstance in its analysis of black electoral success.

Appellants' argument fails. In Jenkins II, we "express[ed] no opinion on the relationship between the consideration of special circumstances in the two contexts (sustained proportional representation and white bloc voting)." Jenkins II, 4 F.3d at 1119 n.9. Ironically, in its original opinion, the district court considered special circumstances in the context of its findings on sustained proportional representation but erroneously failed to apply those findings to its evaluation of white bloc voting. Id. We noted that Gingles requires the district court to consider those

15

circumstances in the context of white bloc voting, id., and, on remand, the district court did so.

We now find that it is quite reasonable to hold that a particular election must be discounted for one purpose but not another. Here, the district court's finding that a black-black election should be discounted for purposes of evaluating white bloc voting does not compel the conclusion that the same election must be discounted when evaluating minority electoral success. To the contrary, the fact that two black candidates ran in one election, unopposed by any white candidate, is evidence of black electoral success. It demonstrates that blacks in Red Clay can and do put forward and support candidates who can succeed. The appellants actually seem to be asking us to discount any evidence of black electoral success; this we cannot do. There was no error in giving weight to the electoral success of Scotton in 1990.4

c. Election of Ronald Greene in 1991

Ronald Greene, a black candidate, defeated Russell Fiske, a white candidate, in a 1991 election for a special one-year term. The court found that both statistical and lay testimony demonstrated that Greene was the minority-preferred candidate. Jenkins III, 1996 WL 172327, at *9. This finding has not been challenged on appeal, and we accept it as not clearly erroneous.

d. Election of Charles Cavanaugh in 1988

In 1983, Cavanaugh, a white candidate, defeated Betty Anderson, who is black. The district court found that

---

4. In a footnote to their brief, appellants also argue that the court erred in finding that Scotton, rather than her opponent Shockley, was the minority-preferred candidate in 1990. Br. at 32 n.15. There is no detailed argument on this point, and we decline to address it. However, the evidence we have reviewed supports the district court's finding on this matter, and we view the argument as an effort by the appellants to persuade us (and the district court) to disregard all evidence of minority electoral success. For a more detailed discussion of this question, see Jenkins III, 1996 WL 172327, at *8 (comparing statistical evidence supporting Scotton's status as the minority-preferred candidate to plaintiffs' lay testimony about minority support for Shockley).

16

Anderson was the minority-preferred candidate in that race. In 1988, Cavanaugh, running unopposed, won reelection. Evaluating the factors delineated in Jenkins II, the district court concluded that by 1988 "Cavanaugh was the representative of choice of minority voters," and was the minority-preferred candidate. Id. at *7, 6. The district court found that Cavanaugh had become focused on the needs and interests of the minority community during his earlier term, and that in 1988 he was supportive of issues important to the minority community. Id. at *6. Additionally, the court found that there were no impediments to a minority candidate entering the 1988 race against Cavanaugh. Id. at *7.

This finding may be questionable, given that the district court recognized that no evidence demonstrated that the minority community advanced, conducted, or financed Cavanaugh's campaign in 1988. Id. at *6. Additionally, the court noted that there was no evidence that Cavanaugh's unopposed race affected black or white voter turnout. Id. Although the finding that Cavanaugh was minority-preferred may not be clearly erroneous, it is certainly not well supported. The district court should have discounted this race as having no impact on minority electoral success, just as it discounted this race in its assessment of white bloc voting, id. at *16.

e. Election of Patricia Reinbold in 1989

Reinbold, who is white, defeated white candidate Donald Schneck in 1989. Based on evidence that Reinbold campaigned on issues of concern to the minority community, blacks were involved in Reinbold's campaign efforts, important black community leaders supported Reinbold, and there were no barriers to a black candidate running in the election, the district court concluded that Reinbold was the minority-preferred candidate. Id. at *7-8. The court found that although black voter turn out decreased disproportionately in that year, the decrease could not be attributed to the absence of a black candidate. Id. at *7.

The district court's conclusion that Reinbold was the minority-preferred candidate was not clearly erroneous.

17

Moreover, as noted above, individual elections can be accorded differing weight for different purposes. Although a white-white election obviously is of less relevance to an analysis of white bloc voting, it is relevant to an assessment of minority electoral success if white minority-preferred candidates defeat other white non-minority-preferred candidates. The district court did not err in considering this election in its assessment of minority electoral success.

### f. Conclusion on Minority Electoral Success

Section 2 guarantees equality of opportunity for minority participation in the electoral and political processes. It does not focus on whether minorities are able to elect other minorities to office, but rather addresses whether minorities have an equal opportunity to elect representatives of their choice, whatever their race, to office. Although the district court did err in some respects, on the whole, discounting the elections which should have been weighed less heavily or ignored in the analysis of minority electoral success, we find that the district court did not commit clear error in concluding that minority electoral success, while not reaching sustained levels of proportionality, was substantial. Although several black candidates who sought election were defeated, often by white candidates, others were successful, and in some elections minorities also were able to elect white candidates of their choosing. The electoral success of Roberts, Scotton, Greene, and Reinbold support the finding of substantial minority electoral success. As the district court reasonably found, "Considering that black voters comprise only 13% of the VAP [voting age population], their success has been great. It has not been persistent or sustained, but it has been impressive." Id. at *24. These findings supported the district court's conclusion that under the totality of the circumstances, no section 2 violation was established.

### 2. Analysis of the Remaining Senate Report Factors

Appellants challenge the district court's findings on many of the Senate Report factors as erroneous and also argue that the court improperly weighed the different factors in its evaluation of the totality of the circumstances. Wefirst will

18

discuss the court's assessment of each factor and then evaluate the weight ascribed to each factor in its analysis of the totality of the circumstances.

a. Past and Present Discrimination

Finding a history of discrimination against minorities in Delaware and a general lower socioeconomic status of minorities in Red Clay, the district court concluded that those factors might have caused the demonstrated depressed minority political and electoral participation in Red Clay. Id. at *20. Appellants challenge only the weight accorded this finding in the totality of the circumstances analysis.

b. Racial Polarization of Voting

Based on its findings of voting cohesion among blacks as well as legally significant white bloc voting, the district court determined that voting in Red Clay is, to a degree, racially polarized. Id. at *21. This finding is not challenged on appeal.

c. Effects of other Electoral Practices or Procedures

On remand, the district court reaffirmed that the opportunity for electoral discrimination against minorities was not enhanced by other features of the Red Clay electoral system, such as the size of the district, the plurality-win rule, or the anti-single shot voting provision. Id. For example, although the anti-single shot rule precludes resort to a strategy that minorities could employ to elect candidates of their choosing, the court noted that it also ensures that citizens from each district in Red Clay have representatives on the Board. Id. These findings were not clearly erroneous.

The district court also noted that other aspects of the Red Clay voting system were beneficial to minorities, particularly the absence of any voter registration requirements and the ability of voters to vote at any polling place in the district. Id. at *22. The court correctly concluded that these elements of the electoral system make it easier for minorities to vote. Similarly correct were the district court's original findings that the use of Tuesdays rather than Saturdays as election days did not enhance the

19

opportunity for discrimination. Jenkins I, 780 F. Supp. at 236.

The district court did not discuss in either opinion the appellants' charges that the opportunity for discrimination was enhanced by the low appointment rate of blacks as poll workers and election officials in school board elections. The parties stipulated that during a three-year period only ten of 149 such appointments were black. While this number obviously reflects some disparity, the appellants have not alerted us to any other record evidence on this issue, so it is not possible to determine whether the disparity is the result of intentional discrimination or how that disparity affects voter turnout.

The appellants also claim that the district court erred "because of its failure to acknowledge that [the voting practices and procedures] include a nominating-district residency requirement that creates a direct barrier to minority candidacies outside the two Wilmington-based nominating districts." Br. at 48. This is a more serious concern; however, the district court adequately addressed this issue in its original opinion, concluding that the system promotes slating and also ensures that citizens from all areas of the district will be represented on the board. Jenkins I, 780 F. Supp. at 235. The court concluded that although the system precluded single shot voting which can help minorities elect candidates of their choosing, overall this feature of the electoral system did not work either in favor of or against minority voters. Id. at 235-36. The district court again discussed this issue on remand, and reaffirmed its earlier findings. Jenkins III, 1996 WL 172327, at *21.

Appellants' contention that a nominating district requirement limits minority candidates to the two Wilmingon-based nominating districts strikes us as highly ironic. The appellants have brought this action seeking the establishment of a single-member district system with each district electing its own member. Thus, for example, only residents of District B could vote in the elections for the member from District B, and those residents could vote in only those elections. The theory, of course, is that a single-member district could become a majority-minority district,

20

thus leading to the election of a minority member. Yet, surely the appellants should recognize that according to their theory of this case, the system they seek would tend to limit minority candidates to the majority-minority district or districts. Although under the at-large system, black candidates most frequently run for election in Districts A and B, minority candidates have run for election from five different districts. Id. at *27. Thus, appellants now complain about a system that they seek to perpetuate and strengthen.

On the whole, as the district court explained, the Red Clay election procedures "are open and accommodating and do not enhance the opportunity for discrimination against black citizens." Id. at *22. Thus, the district court's findings about the features of the Red Clay electoral system were not clearly erroneous.

d. Accessibility of Slating Processes to Minority Candidates

The district court reaffirmed its original conclusion that the slating processes are open to minority candidates. Id. This conclusion is not challenged on appeal.

e. Use of Racial Appeals in Election Campaigns

On remand, the district court reaffirmed its original conclusion that racial appeals were not used in Red Clay elections. Id. at *23. Appellants argue that the district court improperly discounted the use of a flyer during the 1988 campaign that warned against voting for a black candidate who might support school population changes to promote racial balance. The district court correctly determined that this flyer did not constitute a racial appeal. Theflyer simply noted the three candidates' positions on changing feeder patterns within the School District, and it did not identify the candidates by race. Although the feeder pattern issue did involve the percentages of students of different races in the various schools and how the candidates might vote on feeder pattern issues, this flyer was more of an issue appeal than a racial appeal, albeit an issue heavily identified with racial concerns. The district court's finding on this factor was not clearly erroneous.

f. Policies Supporting At-Large Multi-District System

The district court reaffirmed its earlier finding that two policies support the use of at-large voting: it promotes

21

broader accountability of the Board members by requiring them to seek support from citizens of all district neighborhoods, and it allows citizens to vote every year for Board members, rather than once every five years, when a particular district seat comes up for election. Id. at *24-25. The district court found that the relationship between these policies and the use of the at-large electoral system was not tenuous. Moreover, all but one school district in Delaware elect board members in this manner. The common usage of this system further supports the district court's conclusion that the policies advanced in support of the at-large system are sufficiently related to the use of the system. The finding was not clearly erroneous.

g. Responsiveness of the Board

The district court reaffirmed its original finding that the Board had been unresponsive to minority concerns despite improvement in the areas of employment of black teachers and administrators and concerns about how black children were being placed into special education classes. Id. at *25. The court also noted, however, that a federal court now has held that the schools of Red Clay are desegregated, although there was substantial delay in achieving that result. Id. Also, some Board members, both black and white, have begun to represent and advocate for issues of concern to minorities. Id. Finally, the court noted that recent electoral victories of black and white minority-preferred candidates might represent or lead to increased responsiveness by the Board to minorities. Id. While the court found these factors significant, it still concluded that, on the whole, this Senate Report factor weighed in favor of appellants. This finding was not clearly erroneous.

h. The Totality of the Circumstances

In weighing the Senate Report factors in this case, the two most important factors, the existence of racially polarized voting and the extent of minority electoral success, tilted the balance in different directions.

The district court found "legally significant, although not overwhelming, white bloc voting," in Red Clay. Id. at *18. The district court was entitled to accord substantial weight to the existence of white bloc voting in its analysis of the

22

totality of the circumstances; the fact that the white bloc voting was "not overwhelming" did not require the court to discount significantly this factor. However, the court was required to weigh this factor against its finding of substantial minority electoral success, and it did so, concluding that "[w]hile there has been legally significant racially polarized voting in Red Clay, the results of that one legal test do not tell the whole story." Id. at \*28. In some cases, for example, either white bloc voting was not responsible for the defeat of a minority or minority-preferred candidate or there was actually cross-over white voting for such candidates.

In the analysis of the totality of the circumstances, substantial minority electoral success strongly counterbalances the racially polarized voting. The significance of the level of minority electoral success achieved in Red Clay further is evidenced by the district court's comparison of the success achieved under the at-large system and the projected minority electoral success the appellants' proposed single-district system would produce. This comparison underscores the propriety of the district court's finding that no Section 2 violation was established by demonstrating that the proposed system would be unlikely to produce increased minority electoral success.5

Relying on appellants' expert's testimony, the court found that a single district, District B, could be drawn in Red Clay, the voting age population of which would be 55.64% black. Id. at \*27. This district would include sections of two

_____

5. We note that appellants argue that the district court's comparative analysis is flawed because the district court did not discount those elections in which special circumstances contributed to minority electoral success and therefore incorrectly overstated the electoral success in the at-large system. As noted above in the discussion regarding minority electoral success, however, the court's discounting of the elections was related to its assessment of white bloc voting, not minority electoral success. Although we found that some of those elections should have been discounted in the analysis of minority electoral success as well, we conclude that the district court's comparative analysis of the two electoral systems is not rendered clearly erroneous by its failure to discount these elections.

23

existing nominating districts, Districts A and B, and would enjoy, according to our calculations, an increase of almost 44% in the percentage of minorities in the voting age population. In the new District A, blacks would comprise 15.46% of the voting age population, id.; as we calculate it, this would represent almost a four percent increase. The district court concluded that if Red Clay adopted a single-member district system, blacks living in the new District B almost always would succeed in electing their chosen candidates, while blacks living outside of Districts A and B would not often succeed in electing their preferred candidates. Id. at *26.

To date, a black candidate has won all of the elections in District B except for the 1985 election in which Harlan Roberts was defeated. Id. Reasoning that the results would be the same if District B were transformed into a majority black district in a single-member district system, the district court concluded that "[b]ecause under the single member district system the minority-preferred candidate can be expected usually to win in District B, Harlan Roberts' loss in 1985 logically could be blamed on the at-large system of election." Id. at *27.

The district court concluded that a single-member system would benefit some minority candidates and voters while disadvantaging others: minority-preferred candidates running in District B would benefit from a change to a single-member district because of the significant increase of the percentage of blacks in the voting age population. Id. Candidates in District A also would benefit, but the portion of black voters for whose votes they would be competing would increase only slightly. Id. However, candidates running in other districts (C, D, E) would be disadvantaged, for the percentage of black voters to whom they could look for support would decrease from 12% to less than 3% in Districts E and D and 5% in District C. Id. The district court also concluded that by concentrating black voters into one district, the single-member plan also might concentrate black candidates into one district, thereby decreasing the representation of blacks outside that district. Id. Finally, the district court concluded that the single-member system might impair the ability of black

24

voters to elect white minority-preferred candidates by decreasing the incentives for white candidates in the non-black majority districts to appeal to black voters due to their decreased percentages in the voting age populations of those districts. Id. at *28. For these reasons, the district court found that "a switch to a single member district would have had and likely would have only a very minor impact, if any, on the success of minority-preferred candidates." Id.6

Given the countervailing weight of the two most important Senate Report factors, the other Senate Report factors are very important in an assessment of the totality of the circumstances. The district court's findings make clear that, although there has been discrimination in Red Clay which may have resulted in the decreased minority voter participation, most of the features of the Red Clay electoral system not only have not increased discrimination against minorities but in several aspects actually have made the electoral system more accessible to minority voters and candidates. Moreover, racial appeals have not been used in Red Clay elections. Finally, the situation in Red Clay seems to be improving, as minority electoral success continues and the Board's responsiveness to minority concerns increases. Given these circumstances, we find that the district court properly weighed all the various Senate Report factors and reasonably concluded that no Section 2 violation was established.

The district court conducted a searching analysis of past and present political realities in Red Clay, and it compared actual minority electoral success with the potential success a single-member system would produce. The district court followed our instructions on remand, and the evidence supported its conclusions. We, too, have made a searching

---

6. We note that in the text of its opinion, the district court discussed the effects of the proposed single-member plan on onlyfive nominating districts. However, it is clear from the record, and from a footnote in the district court's opinion, that the proposed plan would maintain a system with seven nominating districts. App. at 846; Jenkins III, 1996 WL 172327, at *30 n.35. The black voting age population would be 2.13% in proposed District F and 2.86% in proposed District G. Jenkins III, 1996 WL 172327, at *30 n.35.

25

analysis of the numerous facets of this case, and based on that analysis, we are convinced that this case falls into that category of unusual cases where the Gingles factors are proved, but under the totality of the circumstances, no section 2 violation is established. Although racially polarized voting has characterized Red Clay elections, there has been substantial minority electoral success, and a change to a single-member system would not improve appreciably the level of such success. Therefore, the district court correctly concluded that no section 2 violation was established.

## IV. CONCLUSION

The district court's factual findings (except where noted with regard to certain electoral results) and conclusions were not clearly erroneous. We therefore uphold the district court's conclusion that no section 2 violation was established. Consequently, we affirm the order of April 12, 1996, entering judgment in favor of the appellees.

ROSENN, Circuit Judge, dissenting.

When last this case was before our court, Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ., 4 F.3d 1103 (3d Cir. 1993) [Jenkins I], we stated that"it would be a highly unusual case in which a plaintiff successfully proved the existence of the three Gingles factors and still failed to establish a violation [of § 2 of the Voting Rights Act]." Id. at 1116 n.6; see also id. at 1135. Since that time, several other Courts of Appeals have adopted our view.1 Yet today the majority retreats from the compelling mandate of Jenkins I, finding a "highly unusual" situation in the ordinary and ambiguous details of the case as currently presented. For this reason, I respectfully dissent.

The majority correctly states that the Gingles factors are merely preconditions to a successful § 2 challenge, and that courts must look beyond these factors to the totality of the circumstances. The majority is also correct in stating that the totality of the circumstances analysis focuses on the Senate Report factors, and that the two most important factors are "the extent to which voting in the elections of the state or political subdivision is racially polarized" and "the extent to which members of the minority group have been elected to public office in the jurisdiction." But the majority's analysis hinges on its view that minority candidates have enjoyed "undeniably substantial success" in Red Clay elections. I see the elections through a different lens. The majority's weighing of the Senate Report factors is imbalanced, and its affirmance of the district court decision is unwarranted.

In focusing on the details of this case, the majority has apparently overlooked the broad sweep of the Voting Rights Act of 1965, 42 U.S.C. § 1973, and its 1982 amendments. The Act is widely considered to be the most successful piece of civil rights legislation ever enacted by Congress. See, e.g., Alexander Athan Yanos, Note, Reconciling the Right to Vote

_____

1. See, e.g., Clark v. Calhoun County, 88 F.3d 1393, 1396 (5th Cir. 1996); Uno v. City of Holyoke, 72 F.3d 973, 983 (1st Cir. 1995); NAACP v. City of Niagara Falls, 65 F.3d 1002, 1020 n.21 (2d Cir. 1995); Nipper v. Smith, 39 F.3d 1494, 1514 (11th Cir. 1994), cert. denied, 115 S. Ct. 1795 (1995).

27

With the Voting Rights Act, 92 Colum. L. Rev. 1810, 1835 (1992). President Lyndon Johnson recognized the critical importance of the vote to minorities when he responded to the Civil Rights Act of 1964 by stating, "Yes, yes, . . . I want all of those other things -- buses, restaurants, all of that -- but the right to vote with no ifs, ands, or buts, that's the key." Merle Miller, Lyndon, An Oral Biography 371 (1980).

The 1982 amendments to the Voting Rights Act acknowledged that while outright deprivation of the right to vote was more or less a thing of the past, minority vote dilution was still a tenacious problem. See, e.g., Armand Derfner, Vote Dilution and the Voting Rights Act Amendments of 1982, in Minority Vote Dilution 145, 145 (Chandler Davidson ed., 1984). When it enacted the amendments, Congress was aware that at-large elections were seen as the principal impediment to minority representation. See, e.g., Timothy G. O'Rourke, The 1982 Amendments and the Voting Rights Paradox, in Controversies in Minority Voting 85, 110 (Bernard Grofman & Chandler Davidson eds., 1992).

The purpose of Section 2 is to prohibit electoral arrangements which "dilute" (i.e., diminish) the voting power of racial minority groups. For example, at-large electoral systems (which allow every voter to vote for as many candidates as there are legislative seats to be filled in an entire jurisdiction) often violate Section 2 by allowing a cohesive racial majority to elect every single legislator, thereby leaving racial minorities unrepresented.

Michael E. Lewyn, When Is Cumulative Voting Preferable to Single-Member Districting?, 25 N.M. L. Rev. 197, 197 (1995) (footnotes omitted).

It is against the broad mandate from Congress, that we eliminate minority vote dilution resulting from at-large electoral systems, that we must evaluate the case now before us. Plaintiffs had asked the district court to order Red Clay to adopt a system of single-member districts, the traditional remedy in cases of this sort, see, e.g., Lewyn, supra, at 197, and one which would virtually guarantee that minorities are represented on the Red Bank school

28

board. The majority has instead, by affirming the district court decision, placed its imprimatur on a system which only by a series of flukes and anomalies has permitted any minority representation at all. This cannot be the desire of Congress, and it most certainly is not that of the Supreme Court. See Thornburg v. Gingles, 478 U.S. 30, 76 (1986) ("Where multimember districting generally works to dilute the minority vote, it cannot be defended on the ground that it sporadically and serendipitously benefits minority voters.").

When we examine the "undeniably substantial success of minority candidates" upon which the majority relies, we see that it is neither undeniable nor substantial. The majority itself acknowledges that Harlan Roberts' 1981 plurality victory was a never-repeated situation which should be discounted. This echoes our view in Jenkins I in 1993:

Since no candidate, black or white, has won with a mere plurality since 1981, and only one black candidate has run in an election against more than a single opposing candidate since 1981, the court could not have concluded on this record that the plurality scheme had the actual effect of allowing the black voters of Red Clay to elect their representatives of choice even though the white voters consistently voted against the minority-preferred candidates in numbers sufficient to prevent those candidates from winning a majority of the overall vote.

Jenkins I, 4 F.3d at 1123.

Carolece Scotton, who was slated with a white, suburban candidate, beat another black candidate in an election in which no white candidate chose to run. The election took place in 1990, the year after this lawsuit was filed. The Supreme Court has noted that it might be proper for lower courts to view with some caution the success of black candidates during the pendency of litigation. Gingles, 478 U.S. at 76. See also Zimmer v. McKeithen, 485 F.2d 1297, 1307 (5th Cir. 1973) ("[S]uch success might be attributable to political support motivated by different considerations -- namely that election of a black candidate will thwart successful challenges to electoral schemes on dilution

29

grounds."); <u>Gingles v. Edmisten</u>, 590 F. Supp. 345, 367 n.27 (E.D.N.C. 1984) ("[I]n some elections the pendency of this very litigation worked a one-time advantage for black candidates in the form of unusual organized support by white leaders concerned to forestall single-member districting . . ..").

Ronald Greene won against a white candidate in a mid-term election with exceptionally low voter turnout. Greene was perceived as being aligned with white suburban interests, presumably because of his strong opposition to mandatory school reassignment. On the morning of the election, a flyer was distributed stating that the white candidate, Fiske, had withdrawn from the race. Fiske testified that this had a major impact on the election because the timing made it impossible for him to respond that the statement was untrue.

We see that of ten black candidates to run in Red Clay in the years 1981 to 1991, only three succeeded: one (Roberts) in a never-repeated plurality win, one (Scotton) by defeating another black candidate, and one (Greene) in a little-noticed mid-term election. This hardly exemplifies substantial or consistent electoral success. On the contrary, it demonstrates legally significant white bloc voting. The dismal picture is not improved by adding into the mix the two white candidates characterized by the district court as "minority-preferred," and upon which it relied so much in reaching its ultimate result. The majority acknowledges that Charles Cavanaugh was, in fact, <u>not</u> minority-preferred, and the district court "should have discounted this race as having no impact on minority electoral success." Maj. op. at 17. As to the other white candidate, Patricia Reinbold, of the two blacks identified by her as important in her campaign, only one testified before the district court. He had this to say in response to a query as to why he supported Reinbold: "I guess I couldn't stand Schneck, who was running against her." This is not the sort of "minority sponsorship" we envisioned when, in <u>Jenkins I</u>, we gave explicit instructions for determining whether a white candidate is "truly the minority community's representative of choice." <u>Jenkins I</u> at 1126.

30

Our decision today guarantees that minority voting rights in Red Clay will continue to depend upon happenstance. This is not what Lyndon Johnson envisioned when he instructed his attorney general to write the "toughest voting rights act that you can devise." Howell Raines, My Soul Is Rested 337 (1977). It is not what Congress envisioned when it gave the president that law, and then made it even more effective with the 1982 amendments. And it is not what this court envisioned when in Jenkins I we emphasized repeatedly the rarity of a case where "an electoral system that routinely results in white voters voting as a bloc to defeat the candidate of choice of a politically cohesive minority group is not violative of § 2 of the Voting Rights Act." Jenkins I at 1135.

I believe that the plaintiffs' proof of the three crucial Gingles factors and other elements that show impeded access by black citizens to full participation in the Red Clay School District more than meet the tests necessary to establish a violation of Section 2 under the totality of the circumstances. In light of the prolonged history of this case and its remand in 1993, remand for further findings would only aggravate an obviously unsatisfactory situation. Accordingly, I would reverse the district court's judgment for the defendants and remand the case to it to fashion forthwith an appropriate remedy.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

31