CARL E. STEWART, Chief Judge,
dissenting:
Unlike most § 2 appeals, this case does not turn on the district court’s factual determinations, as the facts are virtually undisputed. Rather, this case concerns the trial court’s application of precedent in its pivotal “totality of the circumstances” analysis. Thus, my departure from the panel majority is based not on the district court’s factual determinations but rather the manner in which the court applied the controlling legal standards to these facts. The majority opinion affirms the district court’s judgment based on its factual findings and determines that the court’s totality of the circumstances analysis was legally tenable. Because I am convinced a deeper analysis is required and that, under such an analysis, Hattiesburg’s electoral scheme violates the Voting Rights Act, I respectfully dissent.
“The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives.” Thornburg v. Gingles, 478 U.S. 30, 47, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). The totality of the circumstances test is a functional appraisal of whether “minorities have, been denied an ‘equal opportunity’ to participate in the political process and to elect representatives of their choice.” Abrams v. Johnson, 521 U.S. 74, 91, 117 S.Ct. 1925, 138 L.Ed.2d 285 (1997) (quoting 42 U.S.C. § 1973(b)). “The need for such ‘totality’ review springs from the demonstrated ingenuity of state and local governments in hobbling minority voting power, a point recognized by Congress when it amended the statute in 1982.” Johnson v. De Grandy, 512 U.S. 997, 1018, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994) (internal citations omitted).
Although district courts are afforded considerable discretion in weighing the to *302 tality of the circumstances so that they may conduct “an intensely local appraisal of the design and the impact of the contested electoral mechanisms,” Gingles, 478 U.S. at 79, 106 S.Ct. 2752 (quotation omitted), U.S. Supreme Court and Fifth Circuit precedent has established certain base principles. First, we follow Clark v. Calhoun Cty. (Clark I)’s lodestar rule that “it will be only the very unusual case in which the plaintiffs can establish the existence of the three Gingles factors but still have failed to establish a violation of § 2 under the totality of the circumstances.” 21 F.3d 92, 97 (5th Cir. 1994) (citation omitted); see also NAACP v. Fordice, 252 F.3d 361, 374 (5th Cir. 2001); Teague v. Attala Cty., 92 F.3d 283, 293 (5th Cir. 1996). “In such cases, the district court must explain with particularity” why it has reached such a conclusion. Clark I, 21 F.3d at 97 (quoting Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ., 4 F.3d 1103, 1136 (3d Cir. 1993)). Second, courts have held that the most important Senate Factors are “the extent to which minority group members have been elected to public office in the jurisdiction” and the “extent to which voting in the elections of the state or political subdivision is racially polarized.” Gingles, 478 U.S. at 48 n.15, 106 S.Ct. 2752. Third, exogenous elections “are less probative than elections involving the specific office that is the subject of litigation.” Clark v. Calhoun Cty. (Clark II), 88 F.3d 1393, 1397 (5th Cir. 1996). And, fourth, “[proportionality is not a safe harbor,” and its presence does not “prove the absence of dilution.” De Grandy, 512 U.S. at 1026, 114 S.Ct. 2647 (O’Connor, J., concurring).
Here, both parties stipulated that the Gingles preconditions had been met. Thus, the district court should have started its inquiry from the established benchmark that a § 2 violation had occurred and then “explained] with particularity” why this was the “very unusual” case where the plaintiffs failed to demonstrate a violation under the totality of the circumstances results test. See Clark I, 21 F.3d at 97. Instead, the district court inverted the analysis: it enunciated the Clark I rule, disregarded it, and proceeded directly to the results test, placing the burden on the plaintiffs to establish that the factual evidence amounted to a § 2 violation. This was legal error.
Moreover, there is insufficient probative evidence in the record to justify a deviation from the Clark I benchmark; thus, the district court’s conclusion that no § 2 violation existed despite the presence of all three Gingles preconditions—a determination courts have made in only a handful of cases nationwide—was also erroneous. The few courts that have found no § 2 violation despite the fact that the Gingles factors were satisfied or assumed did so where, for example, the record did not demonstrate “a history of persistent discrimination reflected in the larger society” or that “bloc-voting behavior portend[ed] any dilu-tive effect.” See NAACP v. City of Niagara Falls, 65 F.3d 1002, 1023 (2d Cir. 1995). Courts have similarly found no § 2 violation where the adopted system arguably increased the opportunity for minority voters to elect representatives of their choice or where minority voters had achieved proportional representation within that system. See Jenkins v. Manning, 116 F.3d 685, 692, 696 (3d Cir. 1997); Niagara Falls, 65 F.3d at 1022; Little Rock Sch. Dist. v. Pulaski Cty. Special Sch. Dist. # 1, 56 F.3d 904, 911-12 (8th Cir. 1995). The Fifth Circuit determined that a case was the “very unusual” exception where only one, non-predominant Senate Factor weighed in favor of the plaintiffs, and all other factors weighed in favor of the defendants. *303 See Fordice, 252 F.3d at 374.[1]
None of these situations is present here. Rather, the district court found, inter alia, that Hattiesburg “has a long, well-established history of official discrimination against African-Americans for the purpose of limiting their participation in the democratic process”; that no black candidate has ever been elected to the Hattiesburg City Council from a majority-white district; and that, despite black citizens comprising over fifty percent of Hattiesburg’s population, black candidates have never secured more than two seats on the five-seat City Council. Additionally, here—unlike in any of the previously cited cases— both predominant Senate Factors weighed in favor of the plaintiffs. Thus, the district court’s judgment, if sustained by the panel majority, will be the outlier case where no § 2 violation exists even though the three Gingles preconditions were indisputably satisfied and the court determined (1) that voting was highly racially polarized and (2) that members of the minority group struggled to be elected to public office in the jurisdiction.[2]
Yet, the district court never explained, with the requisite particularity or otherwise, how it reached this exceptional result. See Clark I, 21 F.3d at 97 (citation omitted). Instead, after determining that the Gingles preconditions were satisfied and three of the Senate Factors—including the two predominant factors—weighed in the plaintiffs’ favor, the district court summarized its conclusion as follows:
After spending a great deal of time considering the evidence, the Court concludes that Hattiesburg’s current ward plan does not practically hinder African-Americans’ opportunity to participate in the political process and elect representatives of their choice. The evidence demonstrates that African-Americans in Hattiesburg enjoy political power in rough proportion to their share of the voting-age population, and that they actively exercise such power through the political process.
For these reasons, the Court finds that Hattiesburg, Mississippi’s current ward plan does not dilute the voting or political power of African-American citizens in violation of Section 2 of the Voting Rights Act.
Although the record is unclear as to how much weight the district court assigned it, the language of the district court’s opinion strongly evinces that the repeated success of black mayor Johnny Dupree in exogenous mayoral elections was an essential, if not dispositive, consideration in the court’s determination that no § 2 violation existed. For example, in assessing the extent to which minority group members have been elected to public office in the jurisdiction— one of the predominant Senate Factors— the district court “note[d] that, as mayor, Dupree wields considerable power.”[3] Thus, *304 although the fact that no black candidate had ever been elected to the City Council from Wards 1, 3, or 4 “tilt[ed] this factor in Plaintiffs’ favor,” the court ultimately concluded that “that fact is mitigated by May- or Dupree’s success in citywide elections.”[4] Additionally, in analyzing the extent of racial polarization in Hattiesburg—the other key Senate Factor—the district court stated that it “[did] not accept Plaintiffs’ argument that voters are polarized at the ‘mathematical maximum’ level,” because a black candidate had won the 2013 citywide mayoral election. Further, despite its disclaimer to the contrary, the district court considered the exogenous mayoral elections in concluding that the effects of Mississippi’s past discrimination do not hinder black citizens’ ability to participate in the political process today. According to the district court, black citizens’ ability to elect a black mayor in four consecutive citywide elections provides “evidence of African-Americans’ robust participation in Hatties-burg’s democratic process.” This comparison, however, is inapposite.
Although the district court was permitted by precedent to consider the results of the exogenous mayor election in its analysis, the court was not permitted to use these results to fatally diminish the impact of the predominant Senate Factors or otherwise tilt the balance in favor of the defendants where the court articulated no other compelling reason for finding that no § 2 violation existed. See Clark II, 88 F.3d at 1397 (exogenous elections “are less probative than elections involving the specific office that is the subject of litigation”). Thus, the district court’s reliance on May- or Dupree’s electoral success throughout its totality of the circumstances analysis was improper and legally erroneous.
The language of the district court’s opinion also evinces that its finding that the number of majority-black districts is “roughly proportional” to black citizens’ share of the voting-age population may have impermissibly affected the outcome of the court’s analysis. Not only is proportionality “not a safe harbor,” see De Grandy, 512 U.S. at 1026, 114 S.Ct. 2647 (O’Connor, J., concurring) (“[proportionality is not a safe harbor,” and its presence does not “prove the absence of dilution”), but the court’s proportionality analysis itself was flawed. The district court determined that black citizens, who comprise 53.04% of Hattiesburg’s total population and 47.95% of its voting-age population but have 40% representation on the City Council, enjoyed electoral success that was “roughly proportional” to their share of *305 the population.[5] The court stated that because “[s]trict proportionality is impossible,” there would “necessarily be an imbalance in one direction or the other.” It explained that it “need not reject one roughly proportional plan because there exists another which may be slightly more roughly proportional” and asserted that the plaintiffs were seeking to “maximize African-American electoral opportunity.” For this reason, the district court determined that the proportionality factor weighed in favor of the defendants.
However, the court failed to consider that the City Council was not limited to creating either three majority-black and two majority-white wards or three majority-white and two majority-black wards. Rather, the City Council was also presented with the option of creating two majority-black wards, two majority-white wards, and one equal opportunity swing ward. This option would also have been more proportional than the plan ultimately adopted by the city. While the district court may be correct that Hattiesburg was not legally required to choose the most proportional plan, that the court gave the proportionality factor, at minimum, a significant role in its totality of the circumstances analysis where the city chose the least proportional plan out of several available options was anomalous at best and legally incorrect at worst.
Thus, although the district court did not explain on what basis it . determined that the totality of the circumstances outweighed the satisfaction of the Gingles factors and the predominant Senate Factors, that the results of the exogenous mayoral election shifted the balance in favor of the defendants cannot be the reason for this conclusion. See Clark II, 88 F.3d at 1397. Nor can the court’s finding of “rough” proportionality have changed the outcome of the analysis. See De Grandy, 512 U.S. at 1026, 114 S.Ct. 2647 (O’Connor, J., concurring). Either of these rationales would be legally impermissible. Absent any other explanation for why the district court strayed from the Clark I benchmark, we are left with the strong probability that the district court misapplied the legal standards.
In my view, the district court’s decision unnecessarily weakens Clark 7’s benchmark guidance that “it will be only the very unusual case in which the plaintiffs can establish the existence of the three Gingles factors but still have failed to establish a violation of § 2 under the totality of the circumstances.” Clark I, 21 F.3d at 97 (citation omitted). If no § 2 violation exists where the Gingles preconditions were indisputably met; both predominant Senate Factors were satisfied; and the trial court acknowledged that the municipality has a long, extensive history of purposeful discrimination against black voters to limit their participation in the political process, that no black City Council candidate has ever been- elected from a majority-white ward, and that black citizens have never achieved proportional representation under the current electoral scheme, virtually no case will ever exist where a § 2 violation is found in this context. For this reason, I respectfully dissent.

.In Fordice, this court stated: "We find that the district court met th[e] requirement [to explain with particularity why it concluded that the contested electoral districts did not violate § 2].... In summary, the district court found that, although Mississippi has an undeniable history of official discrimination ... [the plaintiffs] failed to demonstrate that this reality hindered the ability of Mississippi’s African-American citizens to participate effectively in the state's political process.” Fordice, 252 F.3d at 374.

. The Supreme Court identified these Senate Factors as the “most important” in order to "effectuate[] the intent of Congress.” See Gin-gles, 478 U.S. at 48 n.15, 106 S.Ct. 2752. Diminishing the importance of these key factors without a well-grounded reason therefore runs afoul of § 2 and its intended purpose.

. The court explained, for instance, that May- or Dupree "enjoys superintending control of all the offices and affairs of the municipality,” “supervise[s] all of the departments of the municipal government,” must approve any *304 ordinance passed by the City Council (although the City Council can override his veto with a two-thirds vote), and "may attend meetings of the council and take part in [its] discussions” (internal quotation marks omitted).
However, it is also clear that Mayor Du-pree’s power is limited and that Hattiesburg’s electoral scheme has thwarted the interests of the black community on matters of vital importance. Although the district court noted that between October 2011 and September 2014, 91.2% of the City Council’s votes were unanimous, black councilmembers have been unable to prevail on issues of particular concern to the black community. For example, votes on the adoption of the redistricting plan currently in dispute and a proposed properly tax increase to meet the school board’s funding request (over 90% of the students in the Hattiesburg Public School District are black) broke down along racial lines, with the result that black councilmembers were outvoted.

. Although the district court focused on May- or Dupree's "considerable power” in its analysis of this Senate Factor, the court cites no authority—nor does any appear to exist—that such a consideration is part of the inquiry into "the extent to which minority group members have been elected to public office in the jurisdiction.” See Gingles, 478 U.S. at 48 n.15, 106 S.Ct. 2752.

. By contrast, white citizens make up 40.48% of Hattiesburg's total population and 45.98% of its voting-age population but have 60% representation on the City Council.